Alester G., III and Mary O. FURMAN; William M. and Mary F. McGinty; Jackson H. and Beverly C. Brown; William C. and Helen M. Williams; and Frank S. and Rosalie H. Poe, Plaintiffs,

v.

UNITED STATES of America, Defendant.

Civ. A. No. 83–1249–3.

United States District Court, D. South Carolina, Greenville Division.

July 27, 1984.

Merline, Thomas & Stuart, P.A. by David A. Merline, Rainey, Britton, Gibbes & Clarkson by Frank H. Gibbes, III, Greenville, S.C., for plaintiffs.

Department of Justice by Mark Muedeking, Tax Div., Washington, D.C., for defendant.

## MEMORANDUM ORDER

GEORGE ROSS ANDERSON, Jr., District Judge.

This is a tax refund suit wherein several taxpayers seek refunds of taxes and interest paid for the year 1978, plus statutory interest thereon. Each of the taxpayers filed timely joint U.S. Individual Income Tax Returns for 1978 showing liability on those returns as follows:

| TAXPAYERS | TAX LIABILITY PER ORIGINAL RETURN |
|---|---|
| Alester G. Furman, III and Mary O. Furman | $171,740.67 |
| William M. McGinty and Mary F. McGinty | $82,963.00 |
| Jackson H. Brown and Beverly C. Brown | $90,893.00 |
| William C. Williams and Helen M. Williams | $92,948.00 |
| Frank S. Poe and Rosalie H. Poe | $83,447.00 |

After audit of each of the returns listed above by the Commissioner of Internal Revenue (hereinafter the "Commissioner"), deficiencies were timely proposed and assessments were timely made as follows:

| TAXPAYERS | ASSESSMENTS | ASSESSMENT DATE |
|---|---|---|
| Alester G. Furman, III | $17,839.33 (T) | 7/19/82 |
| Mary O. Furman | 5,420.46 (I) | 7/19/82 |
| William M. McGinty | $12,281.00 (T) | 7/19/82 |
| Mary F. McGinty | 3,731.58 (I) | 7/19/82 |
| Jackson H. Brown | $16,811.00 (T) | 7/26/82 |
| Beverly C. Brown | 5,108.01 (I) | 7/26/82 |
| William C. Williams | $17,036.00 (T) | 7/19/82 |
| Helen M. Williams | 5,176.38 (I) | 7/19/82 |

| TAXPAYERS | ASSESSMENTS | ASSESSMENT DATE |
|---|---|---|
| Frank S. Poe | $6,842.00 (T) | 7/19/82 |
| Rosalie H. Poe | 2,078.94 (I) | 7/19/82 |

(T) Tax Assessed.
(I) Interest Assessed.

The plaintiffs paid these amounts and filed their first claims for refund (Forms 1040X) in March, 1982, requesting refunds of tax and assessed interest, plus statutory interest, as follows:

CLAIMS FOR REFUND

| TAXPAYERS | TAX | ASSESSED INTEREST | TOTAL |
|---|---|---|---|
| Alester G. Furman, III and Mary O. Furman | $34,653.00 | $5,420.00 | $40,073.00 * |
| William M. McGinty and Mary F. McGinty | $39,608.00 | $3,731.58 | $43,339.58 * |
| Jackson H. Brown and Beverly C. Brown | $44,384.00 | $5,108.00 | $49,492.00 * |
| William C. Williams and Helen M. Williams | $44,245.00 | $5,176.00 | $49,421.00 * |
| Frank S. Poe and Rosalie H. Poe | $28,921.00 | $2,078.94 | $30,999.94 * |

* Plus statutory interest.

The Commissioner disallowed the plaintiffs' first claims for refund on May 23, 1983, by letter sent certified mail. Thereafter, the plaintiffs timely filed this action on May 25, 1983. Pursuant to leave granted by this Court, the plaintiffs each filed timely second claims for refund in December, 1983 for the same amounts listed above. These second claims for refund, which put forth new theories for recovery, have also been disallowed by the Commissioner. Jurisdiction and venue are, therefore, proper.

The defendant, United States of America, moved for summary judgment. The plaintiffs thereafter filed a cross-motion for summary judgment. The Court concludes that the defendant's motion should be granted and that the plaintiffs' cross-motion must be denied.

The relevant facts with respect to the plaintiffs' claims involve non-compete agreements entered into by the male plaintiffs on January 4, 1977. (The female plaintiffs are parties to this action only by virtue of having filed joint income tax returns, and therefore, all references to the plaintiffs will be references to the male plaintiffs.) The plaintiffs were all stockholders and employees of The Furman Agency, Inc., during 1976. The Furman Agency, Inc. (hereinafter "The Furman Agency") was a South Carolina corporation engaged in the sale of insurance. Its headquarters and principal place of business was Greenville, South Carolina.

NEGOTIATIONS

Beginning in February of 1976 the plaintiffs, as stockholders and members of the Board of Directors of The Furman Agency, began negotiations with Marsh & McLennan, Inc., a major subsidiary of Marsh & McLennan Companies, Inc., and a major multi-national insurance broker, for sale of The Furman Agency. Several proposals for the form of the sale or merger were discussed internally by the plaintiffs and proposed to Marsh & McLennan, Inc. (hereinafter "Marsh & McLennan"). The original proposal was for an exchange of all 66,400 outstanding shares of Furman Agency stock for 86,500 shares of unregistered shares of Marsh & McLennan stock.

These shares of Marsh & McLennan stock were to be held for investment due to federal securities laws. This form was favored by plaintiffs Furman and Poe. However, this proposal was rejected because of possible unfavorable tax treatment for profits realized by the other three plaintiffs. These plaintiffs expressed concern that the profit on their stock would be taxed as income immediately upon transfer of the shares. Therefore, these plaintiffs countered with a proposal for a sale of stock for cash rather than for stock. These plaintiffs were worried about receiving enough cash to pay any taxes due on the sale or merger. On the basis of the above-described conflicts of interest, the plaintiffs agreed that they would individually continue negotiations with Marsh & McLennan and also consider other alternatives.

At a special meeting of the Board of Directors of The Furman Agency the plaintiffs again reviewed the status of their individual negotiations with Marsh & McLennan for the sale of their stock. A summary of this review as found in the minutes of the meeting showed that the individual plaintiffs had established tentative price agreements with Marsh & McLennan for the sale of their Furman Agency stock for cash at the following prices:

| TAXPAYER | NUMBER OF SHARES | PURCHASE PRICE FOR SHARES |
|---|---|---|
| Furman | 32,000 | $1,738,800.00 |
| McGinty | 4,200 | $365,300.00 |
| Brown | 4,000 | $366,800.00 |
| Williams | 3,000 | $329,000.00 |
| Poe | 18,000 | $954,300.00 |

After this discussion of the sale of stock to Marsh & McLennan, the minutes of the special meeting show that the plaintiffs then took up a separate discussion of their negotiations with Marsh & McLennan concerning non-compete agreements. The minutes recorded during this discussion showed that there were substantial actual negotiations over the terms of the non-compete agreements as well as the consideration to be received for execution of these agreements. The recorded minutes showed that the negotiations for the non-compete agreements were separate and distinct from the negotiations for the sale of stock.

Based on these negotiations, each of the plaintiffs entered into two separate contracts with Marsh & McLennan. The first was an Agreement for Purchase of Stock, the second was an employment and non-compete contract.

## THE AGREEMENTS FOR PURCHASE OF STOCK

On November 17, 1976, each of the plaintiffs entered into an Agreement for Purchase of Stock with Marsh & McLennan. Plaintiffs McGinty, Brown and Williams each entered into separate, individual sales agreements. On the same date, Furman entered into two separate agreements for the sale of his stock. The first was an individual agreement with Marsh & McLennan for the sale of 2,697 shares of Furman Agency stock. Furman's second sales agreement was entered into along with Poe. Under this agreement, plaintiffs Furman and Poe agreed to sell all of Poe's stock (18,000 shares) and all of Furman's remaining shares of Furman Agency stock (29,303 shares) to Marsh & McLennan.[1]

1. In addition, Furman also sold 5,124 shares of stock in The Furman Life Insurance Brokerage Co., Inc. to William M. Mercer Co., Inc. on November 17, 1976. In consideration for this sale, Furman received $109,177 upon closing in 1977 and $36,393 in 1979, for a total sales price of $145,570.

Pursuant to these November 17, 1976 stock sales agreements the plaintiffs each sold their shares in The Furman Agency according to the following basic terms:

| PLAINTIFF | TOTAL NUMBER OF SHARES SOLD | PAYMENT TERMS | | TOTAL SALES PRICE |
|---|---|---|---|---|
| Furman | 32,000 | 1977 – $1,304,099 | 1979 – 434,701 | $1,738,800 [2] |
| McGinty | 4,200 | 1977 – $273,975 | 1979 – 91,325 | $365,300 |
| Brown | 4,000 | 1977 – $275,100 | 1979 – 91,700 | $366,800 |
| Williams | 3,000 | 1977 – $246,750 | 1979 – 82,250 | $329,000 |
| Poe | 18,000 | 1977 – $715,725 | 1979 – 238,575 | $954,300 |

These amounts actually received by the plaintiffs for the sale of their Furman Agency stock are the same as amounts negotiated for the sale of said stock as reported at the special meeting of the Board of Directors. The Agreements for Purchase of Stock entered into by each plaintiff are indistinguishable in all respects except for the names of the plaintiffs, the numbers of shares sold and the prices to be paid for those shares.[3]

Each of the plaintiffs actually received the full amount contained in the stock purchase agreements. For each plaintiff part of the sales price was received in 1977, and the remaining balance was received in 1979. Each plaintiff took these amounts into income in 1977 and 1979 on his respective Schedule D for each year. Pursuant to this reporting of income, the plaintiffs claimed, and were allowed, long-term capital gain treatment for these amounts in 1977 and 1979.

## THE NON-COMPETE AGREEMENTS

In addition to the stock sale agreements, each of the plaintiffs also entered into a non-compete agreement with the buyer, Marsh & McLennan. In each case, the non-compete agreement was separate and distinct from the stock purchase agreement and was contained in a separate and distinct document. There was no mention of these non-compete agreements in the stock sale agreements and the plaintiffs produced no other documents which required the parties to enter into these later non-compete agreements. These non-compete agreements were dated January 4, 1977, 48 days after the date of the stock purchase agreements. Like the stock purchase agreements, the non-compete agreements are indistinguishable in all respects, except for the name of the promisor and the stated consideration to be paid for the promise not to compete.

Pursuant to these January 4, 1977 non-compete agreements, each of the plaintiffs actually received the following amounts on the following dates:

---

2. This amount does not include amounts received from the sale of stock of The Furman Life Insurance Brokerage Co., Inc. to William M. Mercer. See fn. 1, *supra*.

3. This is also true with respect to the agreement entered into by plaintiff Furman for the sale of stock of The Furman Life Insurance Co., Inc. See fns. 1 and 2, *supra*.

| PLAINTIFF | AMOUNT RECEIVED PURSUANT TO JAN. 4, 1977 NON–COMPETE AGREEMENT | DATE PAID |
|-----------|--------------------------------------------------------------|-----------|
| Furman | $108,000 | 1/4/78 |
| McGinty | $145,800 | 1/4/78 |
| Brown | $157,680 | 1/4/78 |
| Williams | $151,200 | 1/4/78 |
| Poe | $86,400 | 1/4/78 |

These amounts were separate amounts received by the plaintiffs and were not part or reductions of the amounts which each plaintiff received pursuant to the stock sales agreements.

The plaintiffs reported the separate amounts received pursuant to the January 4, 1977 non-compete agreements on their 1978 income tax returns as amounts allegedly received from "personal services." Based on their allegation that these amounts were for "personal services," each plaintiff included these amounts on their Form 4726, Maximum Tax on Personal Service Income, and claimed that they were subject to the 50% maximum tax rate on personal service income as provided by Internal Revenue Code Section 1348 (26 U.S. C.). Upon audit the Commissioner determined that the plaintiffs were not entitled to Section 1348 maximum tax treatment for these amounts.

This case also involves a third agreement. Prior to entering into either the stock sales agreements or the non-compete agreements the plaintiffs (as employees of the Furman Agency) entered into an Employment and Non-Compete Agreement with the Furman Agency. This Employment and Non-Compete Agreement with the Furman Agency (hereinafter referred to as the Furman Employment Contract) was entered into while the plaintiffs were also the controlling shareholders of The Furman Agency. While the Furman Employment Contract was similar in some respects to non-compete agreement entered into between the plaintiffs and Marsh & McLennan on January 4, 1977, the two agreements are different in several important respects.

First, the parties to the contracts were different. The Furman Employment Contracts were contracts between Furman Agency and the plaintiffs. The January 4, 1977 non-compete agreements were contracts between Marsh & McLennan and the plaintiffs. Second, the consideration passing to the plaintiffs was different. Under the Furman Employment Contracts the plaintiffs each received a yearly salary actually paid by The Furman Agency and received by the plaintiffs. However, under the January 4, 1977, non-compete agreement the plaintiffs each received lump sum payments from Marsh & McLennan on January 4, 1978. Third, the consideration passing from the plaintiffs to each of the other contracting parties was different. While both the Furman Employment Contract and the non-compete agreement with Marsh & McLennan were for three years and contained some similar provisions, the later Marsh & McLennan non-compete agreement contained several significant clauses not found in the earlier Furman Employment Contract. These additional clauses in the Marsh & McLennan non-compete agreement are clearly for the protection of Marsh & McLennan's business, customer lists and employees. These additional promises made by the plaintiffs significantly benefit Marsh & McLennan to an extent not contemplated or covered by the Furman Employment Contract, even to the extent that Marsh & McLennan became the majority shareholder of The Furman Agency.

Finally, the remedy provided Marsh & McLennan under their non-compete agree-

ment with the plaintiffs was significant. Under their January 4, 1977 non-compete agreement the plaintiffs agreed that an injunction would be the proper remedy for the plaintiffs' violation of their duty not to compete with Marsh & McLennan. On the other hand, even if the employment portion of the Furman Employment Contract could be read so broadly as to preclude the plaintiffs from doing any of the things prescribed by the January 4, 1977 non-compete agreement (and, as noted above, it cannot be so broadly construed), the Furman Employment Contract does not provide for injunctive relief with respect to the employment contract portion of that agreement. Therefore, while the two agreements do admit of some similarities, the parties, the consideration passing to each of the parties and the remedy upon breach are quite different and distinct.

The plaintiffs in this action contest the ordinary income treatment afforded by the Commissioner to the amounts they received in 1978 pursuant to the Marsh & McLennan non-compete agreements.

The plaintiffs have taken three different legal positions concerning the tax treatment of those amounts. First, the plaintiffs claim that the amounts received pursuant to the non-compete agreements constituted "personal service income" subject to the 50% maximum tax limitation as imposed in the year 1980 by Internal Revenue Code Section 1348. Second, the plaintiffs alternatively allege that if they are not entitled to "personal service income" characterization and the 50% maximum tax rate, then the non-compete agreements are unenforceable the plaintiffs want the amounts received pursuant to those non-compete agreements to be deemed "additional consideration" received pursuant to the Agreement for Purchase of Stock. In this way, the plaintiffs seek to have the amounts received pursuant to the non-compete agreements reallocated by this Court to the "amount realized" (Internal Revenue Code Section 1001(b)) on the sale of their shares of stock in the Furman Agency,

thus qualifying as long-term capital gain under Section 1221 of the Internal Revenue Code and the deduction for net capital gains provided by Internal Revenue Code Section 1202(c). The plaintiffs' third and final contention is contained in their second claim for refund. There the plaintiffs allege that " * * * [n]o negotiations took place concerning the terms of the Non-Compete agreements." The plaintiffs allege that they are " * * * entitled to long-term capital gain treatment for the payment allocated to the [January 4, 1977, non-compete] agreements because the Non-Compete agreements were not separately bargained for, the agreements were merely incidental to the sale of * * * stock in the Furman Agency, Inc. * * * and the amounts received were in reality paid for good will incidental to the sale of * * * stock."

■ The taxpayers' first allegation that the amounts they received pursuant to the non-compete agreements were amounts which constitute "personal service income" under Section 1348 of the Internal Revenue Code is contrary to the clear wording of that statute. Both Section 1348 and the regulations properly promulgated by the Secretary of the Treasury, make it clear that the plaintiffs are incorrect and that the amounts received pursuant to the non-compete agreements do not constitute "personal service income."

The relevant portions of Internal Revenue Code Section 1348 provided as follows: [4]

(a) *General Rule.*—If for any taxable year an individual has personal service taxable income which exceeds the amount of taxable income specified in paragraph (1), the tax imposed by section 1 for such year shall, unless the taxpayer chooses the benefits of part I (relating to income averaging), be the sum of—

(1) the tax imposed by section 1 on the highest amount of taxable income on which the rate of tax does not exceed 50 percent,

---

**4.** Section 1348 was repealed in 1981 for tax year beginning after December 31, 1981.

(2) 50 percent of the amount by which his personal service taxable income exceeds the amount of taxable income specified in paragraph (1) of this subsection, and

(3) the excess of the tax computed under section 1 without regard to this section over the tax so computed with reference solely to his personal service taxable income.

(b) *Definitions.*—For purposes of this section—

(1) *Personal service income.*—

(A) *In general.*—The term "personal service income" means any income which is earned income within the meaning of section 401(c)(2)(C) or section 911(b) or which is an amount received as a pension or annuity * * *. * * *

Under the general rule contained in Section 1348, amounts which qualified as "personal service income" were subject to a 50% limitation on the rate of tax. In defining "personal service income" Section 1348 states that the 50% limitation applies to amounts which constitute "earned income" within the meaning of Section 401(c)(2)(C) or Section 911(b) of the Internal Revenue Code if those amounts were received pursuant to an employer-employee relationship. Section 911(b) of the Internal Revenue Code, as it was in effect in 1978, provided the following definition of earned income:

(b) *Definition of Earned Income.* —For purposes of this section, the term "earned income" means wages, salaries, or professional fees, and other amounts received as compensation for personal services actually rendered * * *.

In order to be subject to the 50% maximum tax rate provided by Section 1348, the amounts received must have been wages, salaries, professional fees or other amounts received for personal services "*actually rendered*" (emphasis added).

The regulations promulgated by the Secretary of the Treasury (hereinafter the "Secretary") mirrored the definition contained in Internal Revenue Code Section 911(b). In defining "earned income," the regulations provided that:

The term [earned income] does not include such income as dividends (including an amount treated as a dividend by reason of section 1373(b) and § 1.1373–1), other distributions or corporate earnings and profits, gambling gains, or gains which are treated as capital gains under any provision of chapter 1. The term also does not include amounts received for refraining from rendering personal services or engaging in competitive activity or amounts received as consideration for the cancellation of an employment contract.

Treas.Regs. Section 1.1348–3(a)(1)(i)(D). The regulations could not be clearer in that they specifically exclude from the purview of Section 1348 amounts received pursuant to non-compete agreements. In this regard, it is obvious that the regulation is consistent with the language of the statute which requires that amounts be received for services "actually" rendered. Amounts received pursuant to the non-compete agreements at issue in this case were not amounts received for services actually rendered, but rather were amounts received for not earning income in the manner set forth in the agreement. The amounts received were for refraining from rendering personal services rather than actually rendering personal services. Thus, the amounts received by the taxpayers are amounts which, under the language of the statute and the regulations, are clearly excluded from the benefits of Section 1348.

The plaintiffs rely on four cases which they claim support their position that the amounts received pursuant to the non-compete agreements are "personal service income." The first two of these cases, *Tobey v. Commissioner*, 60 T.C. 227 (1973), and *Robida v. Commissioner*, 460 F.2d 1172 (9th Cir.1972), are cases which were decided under Internal Revenue Code Section 911(b). Neither of these cases hold that amounts received pursuant to non-compete agreements constitute "earned income" under Section 911(b). In both of those cases amounts were earned by the taxpayer for

actually doing some work. In *Tobey v. Commissioner, supra,* the taxpayer actually painted pictures and sold them. In *Robida v. Commissioner, supra,* the taxpayer earned money by manipulating slot machines so as to eliminate the element of chance and thereby guarantee his "winnings" as a gambler. The court noted that, like the *Tobey* case, the taxpayer in *Robida* actually performed services, albeit for himself. The taxpayer "earned" the money by what the Tax Court referred to as a "diligent application of an unusual skill or knowledge * * *." Thus the court in that case found that the receipts were "earned" by the taxpayer and were not gambling receipts, which are more properly in the category of passive income, rather than compensation for services performed.

In both of the cases cited above, the courts noted that the amounts were received for the application of skill or the expenditure of time or energy. In other words, the pursuits of the taxpayers were active pursuits. In this case there was no expenditure of skill or time to constitute services "actually" rendered. The term "actually" as used in the statute requires that there be some active effort on the part of the taxpayer. This is demonstrated by these cases. The plaintiffs merely rely on dicta from these cases to support the proposition that this Court should not put too much emphasis on the phrase "personal services actually rendered." However, that dicta does not displace the clear holding of those cases and does not persuade the Court that it should ignore the term "actually" found in the statute.

The plaintiffs also rely on the cases of *Montesi v. Commissioner,* 340 F.2d 97 (6th Cir.1965), and *Davee v. United States,* 444 F.2d 557, 195 Ct.Cl. 184 (1971). These cases do not purport to determine whether amounts received from non-compete agreements constitute "personal service income" or "earned income." Rather, both of these cases hold that amounts received attributable to non-compete agreements constitute "ordinary income" to the recipient. Ordinary income is defined in Section 64 of the Internal Revenue Code. It is the Government's position that these amounts are indeed "ordinary income" which are, by definition, not subject to the 50% limitation contained in Section 1348. Therefore, these cases are inapposite.

In the face of the foregoing, the plaintiffs allege that Treas.Regs. Section 1.1348–3(a)(1)(i)(D), which is obviously controlling, is invalid. The plaintiffs first argue that the regulation is inconsistent with the statute itself. However, this Court, like the Tax Court, rejects this proposition. In the recent case of *Gene L. Kreider, et al.,* para. 84,067 P–H Memo T.C. (decided Feb. 13, 1984) the Tax Court upheld the validity of the regulation questioned by the plaintiffs in this case. This Court adopts the standard applied by the Tax Court as well as its conclusion, stated therein as follows:

The regulation at issue here is not "plainly inconsistent" with section 1348. As in effect in 1977, section 1348(b)(1)(A) defines the term "personal service income" in relevant part as "any income which is earned income within the meaning of * * * section 911(b) * * *." Section 911(b) defines "earned income" as "wages, salaries, or professional fees, and other amounts received as compensation for personal services *actually rendered* * * *." (Emphasis added by Tax Court.) While a good argument can be made for a rule different from the regulation consistent with the policy underlying section 1348, we do not act as a committee to revise the regulations. The Supreme Court has clearly described the limits of our role in this realm:

Alternatives to the Commissioner's * * * rule are of course available. Improvements might be imagined. But we do not sit as a committee of revision to perfect the administration of the tax laws. Congress has delegated to the Commissioner, not to the courts, the task of prescribing "all needful rules and regulations for the enforcement" of the Internal Revenue Code. 26 U.S.C. Sec. 7805(a). In this area of limitless factual variations, "it is the

province of Congress and the Commissioner, not the courts, to make the appropriate adjustments." *Commissioner v. Stridger [Stidger]*, 386 U.S. 287, 296 [87 S.Ct. 1065, 1071, 18 L.Ed.2d 53 (1967)] [19 AFTR 2d 959]. The role of the judiciary in cases of this sort begins and ends with assuring that the Commissioner's regulations fall within his authority to implement the congressional mandate in some reasonable manner. * * * [*United States v. Correll*, 389 U.S. 299, 306–07, 88 S.Ct. 445, 449–50, 19 L.Ed.2d 537 [20 AFTR 2d 5845] (1967) (fn. ref. omitted.)]

The regulation before us is not plainly inconsistent with the statute, and clearly precludes petitioners' argument.

For these reasons, we reject petitioners' argument that the regulation is invalid.

■ The plaintiffs also claim that, even if the regulation is valid, for procedural reasons it should not be applied to them. In this regard they rely on the case of *Elkins v. Commissioner*, 81 T.C. 669 (1983). However, that case is easily distinguished on its facts from the present case. In the *Elkins* case, *supra*, the Secretary issued regulations which changed the tax treatment of the taxpayer's lease after the taxpayer had entered into that lease. That factual situation is distinguishable from the facts in this case in two important ways. First, the regulations first proposed by the Secretary with respect to Section 1348 in December of 1971 were silent on the treatment of non-compete agreements. They neither allowed nor disallowed maximum tax treatment for amounts received from the non-compete agreements. The final regulations (of which the plaintiffs complain) clearly took the position that amounts received from non-compete agree-

ments were not subject to maximum tax treatment. In the *Elkins* case, however, the initial regulations took a clear and stated position while the later regulations took a contrary position. Because the later regulations took a contrary position the Tax Court held that they could not be applied retroactively against that taxpayer.

This raises the second important distinction between the facts in the *Elkins* case and the present case. In *Elkins* the later regulations were issued a few days *after* the taxpayer entered into the relevant agreement. However, in this case the regulation in question was issued in final form *before* the plaintiffs entered into the non-compete agents. The final regulations were issued on December 17, 1976 and the non-compete agents were entered into on January 4, 1977. Therefore, the *Elkins* facts and decision do not apply to this case.[5]

The plaintiffs' next contention is that, if the applicable regulation is valid, the non-compete agreements are invalid under South Carolina law. The parties agree, and the agreement provides that South Carolina law shall govern the enforcement and interpretation of the non-compete agreements.

■ The non-compete agreements are valid under South Carolina law. The validity and social necessity of such contracts which restrict parties' competition with each other is well recognized. Indeed, case law from this state affirms this notion. *Somerset v. Reyner*, 233 S.C. 324, 104 S.E.2d 344, 346 (1958), states that the rule is well settled that restrictive covenants not to compete when sold together with a business and its good will, "will be upheld and enforced." Such covenants must be reasonable and rationally related to the protection of the rights of the parties to the agreement. Citing earlier South Carolina

---

5. The plaintiffs allege that the amounts received under the non-compete agreements were part of the total amount to be received for the sale of stock and thus argue that the relevant date in this regard is November 17, 1976, the date they entered into the stock sale agreements. The Court specifically rejects this agreement *infra*, and notes that the November 17, 1976 stock sale agreements nowhere refer to or require the execution of the later and separate January 4, 1977 non-compete agreements. The plaintiffs have not shown that they or Marsh & McLennan were required to execute the January 4, 1977 non-compete agreements.

authority, the South Carolina Supreme Court reaffirmed the validity of such covenants in *Somerset v. Reyner, supra,* when "(1) supported by a valuable consideration, (2) reasonably limited as to time, and (3) if reasonably restricted as to the place of the territory, that is, where the time is not more extended or the territory more enlarged than essential for a reasonable protection of the rights of the purchasing party." See *Metts, et al. v. Wenberg,* 158 S.C. 411, 155 S.E. 734, 735 (1930).

In support of their contention that the covenants are invalid, the plaintiffs rely on the case of *Sermons v. Caine & Estes Insurance Agency Inc.,* 275 S.C. 506, 273 S.E.2d 338 (1980) (hereinafter referred to as *Sermons* ). The plaintiffs allege that the covenants not to compete in the *Sermons* case are very similar to the agreements entered into by the plaintiffs in the present case. Because the covenants in *Sermons* were held invalid, the plaintiffs contend that their covenants must also be invalid.

Analysis of the *Sermons* case shows the plaintiffs' analysis to be erroneous. The language of the agreement in the *Sermons* case admits of no similarity to the agreements in the present case. The vital terms of the covenants, namely *time* and *area restrictions,* are completely different in each case. In *Sermons* the area restriction was state wide. In addition, one time restriction was indefinite. Clearly, the criteria used by the *Sermons* court to decide the case, namely the over-broad time and area restrictions, bear no similarity to the present case where the time restriction is only three years and the area restriction for actively engaging in the insurance business is only a 50-mile radius of the Furman office in Greenville, South Carolina. Indeed, the South Carolina Supreme Court opinion in *Sermons* suggests that if the area had been reasonably restricted to 50 miles and the time limited to two or three years, the covenants not to compete might have been valid. *Supra* at 273 S.E.2d 339. In a later case the Supreme Court of South Carolina specifically held that a three-year time limitation—the same time limitation

contained in the non-compete agreements in this case—was valid under South Carolina law. Therefore, the three-year period in this case is clearly reasonable and does not make these non-compete agreements invalid. See *Rental Uniform of Florence, Inc. v. Dudley,* 278 S.C. 674, 301 S.E.2d 142 (1983).

■ It is important to note that the plaintiffs raise the alleged invalidity of these non-compete agreements for the first time in this tax case. These plaintiffs have taken no action against Marsh & McLennan to challenge these agreements and have to the present day complied with these agreements. Additionally, the non-compete agreements themselves provided as follows:

It is the desire and intent of the parties that the provisions of this paragraph (1) shall be enforced to the fullest extent permissible under the laws the public policies applied in each jurisdiction in which enforcement is sought. Accordingly, if any particular portion of this paragraph (1) shall be adjudicated to be invalid or unenforceable, this paragraph (1) shall be deemed amended to delete therefrom the portion thus adjudicated to be invalid or unenforceable, such deletion to apply only with respect to the operation of this paragraph in the particular jurisdiction in which such adjudication is made.

Therefore, even if this Court were to find that certain portions of the non-compete contracts were invalid, the remedy would not, by the terms of the plaintiffs' agreements, be invalidity of the entire agreement.

■ Even if the non-compete agreements were completely invalid under South Carolina law, the plaintiffs would still not be entitled to have this Court restructure their agreements with Marsh & McLennan by reallocating the amounts specifically received pursuant to these non-compete agreements to other agreements or contracts which provide for their own agreed-upon consideration. As noted above, the

Stock Purchase Agreements provide for separate and unrelated consideration to be paid to the plaintiffs. Therefore, even if it is assumed that the non-compete agreements are invalid, these amounts should not, *ipso facto*, be allocated to unrelated and otherwise self-contained agreements. For well-established policy reasons, such reallocations are very rare and are made only upon a showing by the plaintiffs of extraordinary circumstances.

■ It has long been settled that the consideration paid for a covenant not to compete is taxable to the recipient as ordinary income. *Nelson Weaver Realty Co. v. Commissioner,* 307 F.2d 897, 904–905 (5th Cir.1962); *Beal's Estate v. Commissioner,* 82 F.2d 268, 270 (2d Cir.1936); *Salvage v. Commissioner,* 76 F.2d 112, 113 (2d Cir.1935), aff'd, 297 U.S. 106, 56 S.Ct. 375, 80 L.Ed. 511 (1936); *Montesi v. Commissioner,* 340 F.2d 97, 100 (6th Cir.1965). Conversely, the consideration paid for stock is ordinarily taxable to the seller (to the extent it exceeds his basis in the stock sold) as gain on the sale of a capital asset. This gain may receive favorable capital gains treatment. From a buyer's standpoint, any sum allocated to the purchase of the stock gives rise to no immediate tax benefits since this sum merely increases the buyer's basis in the stock. But, an amount allocated to a covenant not to compete can be amortized over the life of the covenant, thus reducing the buyer's gross income subject to taxation. See *Balthrope v. Commissioner,* 356 F.2d 28, 31 (5th Cir. 1966). Accordingly, the plaintiffs and Marsh & McLennan had conflicting interests from a tax standpoint when they negotiated the stock purchase agreements and the covenants not to compete. Because any favorable tax consequences to one party would be precisely matched by adverse tax consequences flowing to the other party, the United States had little, if any, reason to look beneath the form that the parties have chosen for the transaction. However, once taxpayers have by their free negotiations chosen the form of a transaction, it is generally accepted that one of those taxpayers may not then try to alter one side of that bargain for tax purposes. In other words, a taxpayer who freely negotiated a transaction with an adverse party should not be allowed to restructure the unfavorable attributes of that deal for tax purposes only. As the Supreme Court noted in *Commissioner v. Nat. Alfalfa Dehydrating,* 417 U.S. 134, 149, 94 S.Ct. 2129, 2137, 40 L.Ed.2d 717 (1974):

> This Court has observed repeatedly that, while a taxpayer is free to organize his affairs as he chooses, nevertheless, once having done so, he must accept the tax consequences of his choice, whether contemplated or not, *Higgins v. Smith,* 308 U.S. 473, 477 [60 S.Ct. 355, 357, 84 L.Ed. 406] (1940); *Old Mission Portland Cement Co. v. Helvering,* 293 U.S. 289, 293 [55 S.Ct. 158, 160, 79 L.Ed. 367] (1934); *Gregory v. Helvering,* 293 U.S. 465, 469 [55 S.Ct. 266, 267, 79 L.Ed. 596] (1935), and may not enjoy the benefit of some other route he might have chosen to follow but did not.

Accord, *Gray v. Powell,* 314 U.S. 402, 414, 62 S.Ct. 326, 334, 86 L.Ed. 301 (1941) ("choice of disregarding deliberately chosen arrangements for conducting business affairs does not lie with the creator of the plan"); *Federal Bulk Carriers, Inc. v. Commissioner,* 558 F.2d 128, 130 (2d Cir. 1977); see also the cases cited in *In re Steen,* 509 F.2d 1398, 1402–1403, n. 4 (9th Cir.1975). To allow a taxpayer to unilaterally reform one end of a bargain could encourage taxpayers to ignore agreements as written in the hope that the courts will give them more advantageous tax treatment. Both parties to a transaction could enjoy tax benefits due to inconsistent reporting of the same transaction. To allow taxpayers to so "whipsaw" the Commissioner would have disastrous effects on our tax system. See generally Lake, *The Whipsaw Problem in Federal Tax Controversies,* 34th Annual N.Y.U. Institute (1976), p. 867.

Because of the well reasoned and established rule contained in Supreme Court cases such as *Commissioner v. Nat. Alfal-*

*fa Dehydrating, supra,* and *Higgins v. Smith, supra,* courts have established very strict standards for taxpayers who seek to unilaterally alter one side of a bargain for tax purposes. These cases impose a considerable burden on the plaintiffs in this case.

In the case of *Deshotels v. United States,* 450 F.2d 961 (5th Cir.1971), a taxpayer sought to contradict the clear and traditional state law meaning of words in a contract affecting his federal tax liability. Though state law allowed the use of parol evidence to reform a contract, the federal court held that for federal tax purposes parol evidence would be insufficient to change the meaning of a document for tax purposes. Also see *United States v. Ivey,* 414 F.2d 199 (5th Cir.1969).

The courts' hostility to such agreements by taxpayers has been demonstrated in scores of other cases which stand for the proposition that a "taxpayer cannot elect a specific course of action and then, when finding himself in an adverse situation, extricate himself by applying the age-old theory of substance over form." *Cornelius v. Commissioner,* 494 F.2d 465, 471 (5th Cir. 1974). In applying this logic to cases similar to this case, the courts have almost uniformly required taxpayers to live by the terms of their written bargains. Though the courts have applied different standards in rejecting taxpayer attempts to escape adverse tax consequences of non-compete agreements, the result has been the same. See *Ullman v. Commissioner,* 264 F.2d 305 (2d Cir.1959); *Sonnleitner v. Commissioner,* 598 F.2d 464 (5th Cir.1979); *Balthrope v. Commissioner,* 356 F.2d 28 (5th Cir.1966); *Harvey Radio Laboratories, Inc. v. Commissioner,* 470 F.2d 118 (1st Cir.1972); *Montesi v. Commissioner,* 340 F.2d 97 (6th Cir.1965). See also *Commissioner v. Danielson,* 378 F.2d 771 (3d Cir. 1967); *Spector v. Commissioner,* 641 F.2d 376 (5th Cir.1981); *Sullivan v. United States,* 618 F.2d 1001, 1004 (3d Cir.1980);

*Forward Communications Corp. v. United States,* 608 F.2d 485, 490, 221 Ct.Cl. 582 (1979); *Connery v. United States,* 460 F.2d 1130, 1134 (3d Cir.1972); *Winn Dixie Montgomery, Inc. v. United States,* 444 F.2d 677, 682 (5th Cir.1971). See generally *Proulx v. United States,* 594 F.2d 832, 219 Ct.Cl. 363 (1979).

The Fourth Circuit seems to have adopted its own standard derived from the whole of the logic of the cases cited above. In *General Insurance Agency, Inc. v. Commissioner,* 401 F.2d 324 (4th Cir.1968) (hereinafter *"General Insurance Agency, Inc."*), the Fourth Circuit appears to have combined both the "economic reality" and the "intent" tests which are generally referred to in the case cited above.[6] In *General Insurance Agency, Inc.,* the parties entered into a non-compete agreement upon the advice of the seller's lawyer. However, unlike this case, the parties made no actual allocation of any portion of the purchase price to this non-compete agreement. The Court, therefore, first considered whether or not the parties "intended to allocate any part of the purchase price to [the] covenant at the time they executed their formal sales agreement." *Supra* at 329.

In this case the parties not only intended to make such an allocation, they actually did make the allocation. Specific amounts were paid under the terms of the stock sales agreements and other specific amounts were received pursuant to the non-compete agreements. Neither agreement refers to the other nor depends upon the other for its validity. After entering into the stock sales agreements on November 17, 1976, neither the plaintiffs nor Marsh & McLennan were bound to enter into the later January 4, 1977 non-compete agreements. Thus it was clearly the intent of the parties to have separate agreements with separate consideration paid for each.

---

**6.** It should be noted that in *General Insurance Agency, Inc.* the court was not faced with the problem of one party seeking inconsistent tax treatment as *both* parties to the agreements were joined as parties to the lawsuit. Cf. *Better Beverages, Inc. v. United States,* 619 F.2d 424 (5th Cir.1980).

The Court in *General Insurance Agency, Inc.* also applied what it called the "economic reality" test. *Supra* at 330. This test requires that the taxpayers establish that the covenant "have some independent basis in fact or some arguable relationship with business reality such that reasonable men, genuinely concerned with their economic future, might bargain for such an agreement." (Footnote omitted.) *Supra*.

The minutes of the meetings of the Board of Directors of The Furman Agency show clearly that there were actual and intensive negotiations between the plaintiffs and Marsh & McLennan over the terms of the January 4, 1977 non-compete agreements. The terms of the agreements were discussed at length by the plaintiffs. It was noted in the minutes that "each [of the plaintiffs] was negotiating a Non-Compete Agreement for sizable consideration, in addition to the sale of stock." Indeed, the plaintiffs even authorized a continuation of life insurance policies to protect against loss of each plaintiff's "non-compete value" because of death prior to entering into the January 4, 1977 non-compete agreement. Thus, it is clear that the non-compete agreements had economic substance and that each plaintiff's "non-compete value" had economic reality sufficient as to cause the plaintiffs to retain life insurance coverage for that value.

The plaintiffs seek to avoid their recorded negotiations and concern with the economic reality of the non-compete agreements by arguing that an analysis of the entire negotiation process shows that there is really no economic substance to the non-compete agreements.

The plaintiffs' affidavits state that they were initially offered $4,844,000 for their Furman Agency stock by Marsh & McLennan. This amount was not to be paid in stock, however, but in a specified number of unregistered Marsh & McLennan stock. The above amount was calculated by the plaintiffs by looking to the per share value of Marsh & McLennan stock traded on the New York Stock Exchange. The plaintiffs argue that there is no substance to the non-compete agreements because they were ultimately paid virtually the same amount in cash for both their stock and the non-compete agreements ($4,966,080). The plaintiffs argue that, contrary to the recorded negotiations contained in the minutes referred to above, amounts were merely "backed out" of the total sales price and allocated to non-compete agreements in order to create a tax deduction for Marsh & McLennan.

The plaintiffs' argument lacks persuasiveness and economic reality in two regards. First, their comparison of the total amount actually received pursuant to the non-compete agreements and the stock sales agreements with their prior valuation of the earlier Marsh & McLennan stock offer is defective. The prior negotiations were for unregistered Marsh & McLennan stock. Such stock must be held for investment and generally does not have as high a fair market value as the registered and traded stock which the plaintiffs used to value their deal. Additionally, the deal as struck provided for the payment of cash and not stock. It is obvious that in most cases a buyer would be willing to part with more of its own unregistered investment securities than cash. When a seller acquires assets with its own stock it has the double benefit of a beneficial acquisition as well as a stable and fixed contribution to its capital. For these reasons the plaintiffs have obviously overstated the cash value of the early proposals. Considering these factors it is apparent that the early history of the negotiations do not support the plaintiffs' argument that the total amount paid under the two separate agreements was in reality intended to be for the sale of stock only.

The second problem with the plaintiffs agreement lies in the allegations that there is no substance to the non-compete agreements because amounts were merely "backed out" of the total sales price and allocated the non-compete agreements. The problem with this agreement is aptly demonstrated by the following table which

compares the amounts received pursuant to the stock sales agreements and the non-compete agreements:

| PLAINTIFF | AMOUNT RECEIVED FOR SALE OF STOCK | AMOUNT RECEIVED UNDER TERMS OF NON–COMPETE CONTRACT | PERCENTAGE |
|---|---|---|---|
| Furman | $1,728,800 | $108,000 | 6% |
| McGinty | $365,300 | $145,800 | 40% |
| Brown | $366,800 | $157,680 | 43% |
| Williams | $329,000 | $151,200 | 46% |
| Poe | $954,300 | $86,400 | 9% |

If the amounts were simply "backed-out" as the plaintiffs allege the percentages would certainly not have been so diverse and detailed. If the plaintiffs allegations were correct that amounts were merely "backed-out" it would be unnecessary to have such detail. When the foregoing table is considered along with the detailed discussion by the plaintiffs of their negotiations with respect to the non-compete agreements as contained in the minutes of the director's meeting of The Furman Agency, this Court must come to the conclusion that the amounts so allocated were based on the relative non-compete value of each of the plaintiffs.

Finally, the plaintiffs have argued that the amounts received under the non-compete agreements were actually received in exchange for "good will." However, if it is the good will of The Furman Agency, then it need only be noted that the agreements as structured were not for the sale of assets of The Furman Agency, but rather for sales by the individual stockholders of their shares of stock in The Furman Agency. In this regard, it is clear that The Furman Agency (a corporation), and the plaintiffs (shareholders) are separate and distinct legal entities. The plaintiffs, then, are not entitled to sell a corporate asset (here the good will of The Furman Agency) because they, as stockholders, do not directly own that asset. *Sonnleitner v. Commissioner,*

598 F.2d 464, 467, n. 10 (5th Cir.1979); *Balthrope v. Commissioner,* 356 F.2d 28, 32 (5th Cir.1966).

If the "good will" sold is their own personal good will, *i.e.,* their good will in the sense that they will not compete or otherwise affect Marsh & McLennan's side of the bargain, then the plaintiffs' argument is merely a semantical exercise and must also be rejected.

Based on the foregoing this Court must conclude that the plaintiffs are not entitled to either capital gains treatment or maximum tax treatment on the amounts which they clearly received pursuant to the January 4, 1977 non-compete agreements. Therefore, the Court hereby concludes that the defendant's motion for summary judgment should be granted and that the plaintiffs' cross-motion for summary judgment should be denied.

IT IS SO ORDERED.