[607 NYS2d 773]

In the Matter of NANCY E. KENNEDY, Appellant, v KENNETH E. KENNEDY, Respondent.

Fourth Department, February 4, 1994

**APPEARANCES OF COUNSEL**

*Richard C. Kram,* Syracuse, for appellant.

*O'Hara & O'Connell, P. C.,* Syracuse *(Peter Crossett* of counsel), for respondent.

## OPINION OF THE COURT

BOEHM, J.

The issue here, apparently one of first impression, is whether income received under a noncompetition agreement is subject to the 65% cap limiting the amount that may be deducted from earnings under CPLR 5241 (g) (1) (ii) for the support of a spouse or a dependent child. We hold that it is not.

I

Petitioner, Nancy E. Kennedy, filed a petition for enforcement of a support order, and respondent, Kenneth E. Kennedy, filed a cross petition for downward modification of his support obligation under that order. While the proceedings were pending, petitioner issued an income execution against Signet Advertising, Inc. (Signet), as an "income payor", pursuant to CPLR 5241 (g) (1), for 65% of the monthly income of $1,444 respondent was receiving from Signet under a noncompetition agreement. Petitioner also requested the Hearing Examiner to change the CPLR 5241 income execution to a CPLR 5242 court-ordered income execution, which would increase it to 100% of the income being paid to respondent by Signet.

After a hearing, the Hearing Examiner entered an order of disposition granting petitioner's request for judgment against respondent for arrears in the amount of $6,593.84 and denying respondent's request for downward modification. Neither that order nor a subsequent order correcting a typographical error addressed petitioner's request for an increase of the income execution to 100% of Signet's monthly payments to respondent.

On September 23, 1992, petitioner issued a new income execution, again pursuant to CPLR 5241, which superseded the prior income execution and garnished 100% of the Signet income. On October 7, 1992, respondent asserted a mistake of fact, pursuant to CPLR 5241 (e), contending that the Signet payments were for personal services for his not competing and for consulting, and that 65%, therefore, was the maximum

amount that could properly be deducted.* After oral argument, the Hearing Examiner disallowed respondent's objection, finding that the CPLR 5241 (g) limitation applied only to income arising out of an employer-employee relationship, and that the existing execution upon the Signet payments was "in keeping with the State's public policy that support arrears have priority over other debts, CPLR 5241 (h)." Respondent filed written objections to the order of the Hearing Examiner, pursuant to Family Court Act § 439, and Family Court granted respondent's objections, rejected the Hearing Examiner's order, and directed that the 100% income execution be corrected to reflect the 65% cap under CPLR 5241 (g).

## II

CPLR 5241 authorizes the issuance of an income execution without a court order to collect arrears due under a temporary or final support order. CPLR 5241 was enacted as part of the "New York State Support Enforcement Act of 1985" (L 1985, ch 809) "to improve child support enforcement and to comply with the Federal Child Support Enforcement Amendments of 1984 by strengthening legal and administrative procedures designed to collect overdue child support obligations" (Mem of Sen William T. Smith, 1985 NY Legis Ann, at 286).

CPLR 5241 inaugurated a broad expansion of the benefits available to a creditor. While the ordinary income execution is limited to a maximum of 10% of income (CPLR 5231 [b]), the percentage available for garnishment under CPLR 5241 (g) is between 50% and 65%, depending upon the debtor's other support obligations and the extent of support arrears. CPLR 5241 (h) also gives priority of execution over any other assignment, levy or process. Moreover, CPLR 5241 eliminates the necessity of a prior judgment and provides for expeditious execution (see generally, Siegel, Practice Commentaries, McKinney's Cons Laws of NY, Book 7B, CPLR 5241, 1994 Pocket Part, at 145-148).

In 1985, when CPLR 5241 was enacted, CPLR 5242 was also added and CPLR 5252 amended. CPLR 5242, which provides

---

* The noncompetition agreement is not in the record, but respondent testified during the enforcement hearing that the payments from Signet were for not competing and for consulting, but that he had not performed consulting work or any other service for Signet subsequent to the making of the agreement.

relief similar to CPLR 5241 except that it requires a court order, superseded section 49-b of the Personal Property Law, which was repealed that same year.

Subdivision (g) of CPLR 5241 provides that, where the income of a debtor is compensation for personal services and where the debtor ("any person directed to make payments by an order of support" [CPLR 5241 (a) (2)]) is not supporting another spouse or child, the amount of the garnishment deduction shall not exceed 60% of disposable earnings. Where, however, the deduction is applied to the reduction of arrears that have accrued for more than 12 weeks, the amount of the deduction may not exceed 65%. "Disposable earnings" are defined as the balance remaining after deducting from compensation those amounts required to be withheld by law (e.g., withholding tax, Social Security) (CPLR 5241 [g] [1] [ii]). "Income" is broadly defined in CPLR 5241 (a) (6) as "any earned, unearned, taxable or non-taxable income, workers' compensation, disability benefits, unemployment insurance benefits".

Prior to the adoption of CPLR 5241, the only source of relief from ruinous income executions was found in Title III of the Federal Consumer Credit Protection Act (Federal Act; 15 USC § 1671 *et seq.*), which was passed as a result of Congressional findings that the "unrestricted garnishment of compensation due for personal services encourages the making of predatory extensions of credit * * * frequently result[ing] in loss of employment by the debtor" (15 USC § 1671 [a] [1], [2]). The maximum garnishment caps in CPLR 5241 are identical with those imposed in the Federal Act, as are the conditions under which they are applied (15 USC § 1673). This is hardly a coincidence, in view of the fact that the Federal Act preempted the garnishment field as it relates to salary and wages, and State law could not, therefore, permissibly establish higher deduction percentages from salary and wages *(see, Midlantic Natl. Bank/N. v Reif,* 732 F Supp 354 [ED NY]; *Hodgson v Hamilton Mun. Ct.,* 349 F Supp 1125 [SD Ohio]; *First Natl. Bank v Columbia Credit Corp.,* 179 Colo 242, 499 P2d 1163). CPLR 5241 is not only duplicative with respect to the percentages, but also contains much of the same terminology as the Federal Act. The percentages are also applied to "disposable earnings", and the definition of that term is the same as in CPLR 5241 (15 USC § 1673).

The cases construing the Federal Act are instructive in determining the categories of income to which the maximum percentages of income that may be garnished are intended to

apply. In summarizing the legislative history of the Federal Act, the United States Supreme Court noted: "There is every indication that Congress, in an effort to avoid the necessity of bankruptcy, sought to regulate garnishment in its usual sense as a levy on periodic payments of compensation needed to support the wage earner and his family on a week-to-week, month-to-month basis." *(Kokoszka v Belford, 417 US 642, 651.)*

Similarly, in *Dunlop v First Natl. Bank* (399 F Supp 855, 856), the court concluded that the purpose of the restrictions on garnishment found in the Federal Act was to govern the relationship between employers and employees and was aimed at "the evils that befall that relationship when wages are garnished."

The construction that the Federal Act was intended to provide a maximum levy only upon periodic earnings was adopted by State courts, as well. For example, the Supreme Court of Wisconsin observed that, because the percentage subject to garnishment under the Federal Act is computed on a weekly basis or other pay period, Congress intended garnishment restrictions to apply only to garnishments from income from a garnishee's employer.

"The restriction on garnishment, sec. 1673 (a), refers to 'disposable earnings of an individual for any workweek.' The percentage of disposable earnings subject to garnishment is to be computed on the basis of weekly and hourly earnings or, if wages are not paid weekly, on the basis of a 'pay period.' The fact that the percentage subject to garnishment is figured on a weekly basis or other pay period implies that Congress contemplated that the restrictions of the statute apply only to garnishment from the employer.

"The term 'earnings,' defined in sec. 1672 (a), specifically refers to compensation for personal services" *(Melby & Co. Bank v Anderson,* 88 Wis 2d 252, 258, 276 NW2d 274, 277).

The foregoing construction also finds support in the interpretation given the Federal Act by New York State courts *(see, General Motors Acceptance Corp. v Metropolitan Opera Assn.,* 98 Misc 2d 307 [App Term]; *Matter of Liedka v Liedka,* 101 Misc 2d 305; *Bigness v Obit,* 112 Misc 2d 1078; *Matter of Carol J. v William J.,* 119 Misc 2d 739; *see also, Kahn v Trustees of Columbia Univ.,* 109 AD2d 395).

## III

This uniform interpretation of the Federal Act, and the

similarities with CPLR 5241 in the Federal Act's limitations and language, compel the conclusion that the maximum deductions in CPLR 5241 are likewise intended to apply only to income derived from earnings for personal services arising out of the employer-employee relationship. This conclusion is reinforced by the usual interpretation given the statutory terminology. Although CPLR 5241 does not define earnings or compensation for personal services, those words have a common and well-understood meaning that has been uniformly applied in a variety of legislative settings.

For example, the Federal Act, which, as noted, was enacted well before CPLR 5241, defines earnings as "compensation paid or payable for personal services, whether denominated as wages, salary, commission, bonus, or otherwise, and includes periodic payments pursuant to a pension or retirement program" (15 USC § 1672 [a]). Similarly, in the Internal Revenue Code, earnings are defined as "wages, salaries, tips, and other employee compensation" (26 USC § 32 [c] [2] [A] [i]).

Section 46 (3) of the Personal Property Law defines "earnings" as "salary, wages, commissions, or other compensation for services." The statute which established a detailed procedure for income executions long before the enactment of CPLR 5241, defines earnings as "compensation paid or payable for personal services, whether denominated as wages, salary, commission, bonus, or otherwise, and includes periodic payments pursuant to a pension or retirement program" (CPLR 5231 [c] [i]).

As can be seen from this brief examination of applicable statutory language, the words "services" and "personal services" are clearly intended to refer to earnings derived from an employment relationship, and it may be assumed that the Legislature intended the same meaning for "personal services" in CPLR 5241 when it was enacted. Earlier statutes are properly considered as illuminating the intent of the Legislature in passing later acts (see, *People ex rel. Marshall v Webster,* 266 App Div 637, *lv denied* 267 App Div 794), and there is a presumption that similar meaning attaches to the use of language in statutes of like import (see, *Reynolds v Village of Nyack,* 258 App Div 667).

## IV

The attempt by respondent to argue that his income from Signet was earned income subject to a 65% cap under CPLR

5241 fails as a similar attempt failed under other circumstances *(see, Furman v United States,* 602 F Supp 444, *affd* 767 F2d 911).

Treasury Regulation (26 CFR) § 1.1348-3 (a) (1) (i), provides: "The term [earned income] * * * does not include amounts received for refraining from rendering personal services or engaging in competitive activity or amounts received as consideration for the cancellation of an employment contract." Section 911 (b) of the Internal Revenue Code, as it was in effect in 1978, defined earned income as follows: "[W]ages, salaries, or professional fees, and other amounts received as compensation for personal services actually rendered".

The question arose whether payments received under a noncompetition agreement should be regarded as earned income. If those payments were deemed earned income, they would be subject to the then 50% maximum tax rate in the Internal Revenue Code. That represented a considerable tax advantage to the recipient. The United States District Court, referring to the foregoing Treasury Regulation and section 911 (b), declared: "Amounts received pursuant to the non-compete agreements at issue in this case were not amounts received for services actually rendered, but rather were amounts received for not earning income in the manner set forth in the agreement. The amounts received were for refraining from rendering personal services rather than actually rendering personal services." *(Furman v United States, supra,* at 451.) The court determined that the amounts received by the recipient under the noncompete agreement were excluded from the benefits of the 50% maximum tax rate. Respondent's income here is the same. It also comes from "refraining from rendering personal services."

## V

We conclude that CPLR 5241, like its Federal counterpart, Title III of the Consumer Credit Protection Act, was not intended to establish a maximum garnishment limit on income generally, but only to that income derived from earnings in an employer-employee relationship. The money received by respondent under his covenant not to compete is, of course, income, but it is not "earnings" as that term has been uniformly defined; it was received neither from employment nor from personal services. Earnings ordinarily cease when employment ceases, i.e., when the services end. Income from a

noncompetition agreement, however, continues for its duration, provided one ceases the prohibited employment. As already observed, it is income for not performing services and, therefore, is not protected by the CPLR 5241 limitations upon income execution.

Accordingly, Family Court's order granting respondent's objections should be reversed and the order of the Hearing Examiner reinstated.

PINE, J. P., FALLON, DOERR and DAVIS, JJ., concur.

Order unanimously reversed, on the law, without costs, objections denied and order of Hearing Examiner reinstated.