**PUBLISHED**

**UNITED STATES COURT OF APPEALS**

**FOR THE FOURTH CIRCUIT**

JEANNE GREENE SNOWA,
Petitioner-Appellant,

v.                                                            No. 95-2864

COMMISSIONER OF INTERNAL REVENUE,
Respondent-Appellee.

Appeal from the United States Tax Court.
(Tax Ct. No. 93-9553)

Argued: April 10, 1997

Decided: August 19, 1997

Before WILKINS and MICHAEL, Circuit Judges, and
BUTZNER, Senior Circuit Judge.

_____

Reversed by published opinion. Judge Michael wrote the opinion, in
which Judge Wilkins and Senior Judge Butzner joined.

_____

**COUNSEL**

**ARGUED:** William S. Carnell, Third Year Law Student, UNIVER-
SITY OF VIRGINIA SCHOOL OF LAW, Charlottesville, Virginia,
for Appellant. Thomas Vincent Linguanti, Tax Division, UNITED
STATES DEPARTMENT OF JUSTICE, Washington, D.C., for
Appellee. **ON BRIEF:** Neil L. Walters, Supervising Attorney, Erin
McCoy, Third Year Law Student, UNIVERSITY OF VIRGINIA
SCHOOL OF LAW, Charlottesville, Virginia, for Appellant. Loretta
C. Argrett, Assistant Attorney General, David I. Pincus, Tax Division,

UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Appellee.

_____

**OPINION**

MICHAEL, Circuit Judge:

In this case we decide how § 1034 of the Internal Revenue Code (the Code) treats a taxpayer seeking deferral of capital gains taxes on the sale of a principal residence if the taxpayer has divorced and remarried during the two-year replacement period. Tax deferral is available under § 1034(a) if the "cost" of the new house exceeds the "adjusted sales price" of the old house. Section 1034(g) allows a married taxpayer to include in her own cost the portion of the purchase price paid by her spouse when calculating the cost of the new home for tax purposes. The Internal Revenue Service (IRS), relying on Treasury regulation § 1.1034-1(f), assessed a deficiency against appellant Jeanne Greene Snowa (Mrs. Snowa) on the grounds that a taxpayer cannot use § 1034(g) unless she used both the old home and the new home as a principal residence with the <u>same</u> spouse. The tax court upheld the IRS. We conclude, however, that the regulation's "same spouse" requirement fails to implement the congressional intent of § 1034(g) in a reasonable manner. Accordingly, we reverse and hold that a taxpayer need not be married to the same spouse to take advantage of § 1034(g).**1**

I.

Mrs. Snowa and her ex-husband, Willis Spivey (Mr. Spivey), used their jointly owned home in Westminster, South Carolina, as their principal residence until they divorced in 1989. They sold the West-

_____

**1** Just as we were about to file this opinion, Congress passed (and the President signed) a bill making significant changes in the federal tax laws. According to press accounts, the new legislation includes changes in the Internal Revenue Code that will expand the capital gains exemption on the sale of a principal residence. We have no occasion in this opinion to address any provisions of the new law.

minster home for $380,000 in November of that year. Mrs. Snowa's one-half share of the sale proceeds was $178,056 after expenses, and her share of the capital gain was $69,518. On Form 2119 (Sale of Your Home) included with her 1989 tax return, Mrs. Snowa indicated that she planned to buy a replacement home within the two-year period allowed by § 1034(a). Mrs. Snowa therefore did not report her one-half share of the capital gain on the sale of the Westminster residence as gross income on her 1989 return. In other words, she sought to avoid capital gains taxes for 1989 by deferring recognition of the gain.

In 1991 Mrs. Snowa married Henry Lin Snowa (Mr. Snowa). The Snowas promptly bought a house together in Jamestown, North Carolina, for $180,668. The Snowas paid for their new home with funds of their own and proceeds of an $85,000 mortgage loan. They were co-signers on the note. The Snowas live in the Jamestown home with their three children and use it as their principal residence. Under North Carolina law the Snowas hold joint title to the property as tenants by the entirety.[2]

Mr. and Mrs. Snowa filed a joint federal income tax return for 1991. They attached Form 2119, reporting their purchase of the Jamestown house as the "replacement residence" for Mrs. Snowa's Westminster residence. Calculations on the form reflected that the Snowas sought to "roll over" or postpone Mrs. Snowa's gain on the sale of her Westminster house. The Snowas stated on the return that they agreed to adjust their basis in the new Jamestown home downward by the amount of gain Mrs. Snowa realized on the sale of the house in Westminster. The IRS rejected this treatment and sent Mrs. Snowa a notice of deficiency stating that she owed an additional $21,037 in income taxes for 1989. The IRS contended that Mrs. Snowa could not roll over the gain because her share of the cost of

---

[2] A tenancy by the entirety is "a form of co-ownership with a right of survivorship created when real property is conveyed to a husband and wife and the unities of time, title, interest, and possession are observed. The estate rests upon the doctrine of unity of the person and takes its origin from the common law where husband and wife were regarded as one." McLeod v. McLeod, 327 S.E.2d 910, 915 (N.C. Ct. App. 1985) (citations omitted).

3

the new home, which the IRS deemed to be one-half of the purchase price, did not exceed her share of the proceeds from the old home. Under § 1034 a taxpayer may roll over gain only to the extent the purchase price of the new home exceeds the adjusted sales price of the old home. See I.R.C. § 1034(a). Mrs. Snowa challenged the deficiency, appearing pro se in the tax court. She argued that § 1034(g) allows her to include her current spouse's share of the purchase price of the new home as her own "cost." Calculated to include her husband's share, Mrs. Snowa's cost of the new home would exceed her share of the proceeds from the sale of the old home, and the rollover of her gain on the sale of the old home would be authorized. The IRS countered that a taxpayer who did not live in both homes with the same spouse may not take advantage of § 1034(g). The tax court agreed with the IRS, and Mrs. Snowa appeals.

II.

It is helpful to look first at the background of§ 1034. Like the sale of any property that appreciates in value, the sale of a house can create taxable gain. Without special provisions, the seller of a house would recognize capital gain on the amount realized from the sale less the adjusted basis in the house (usually the original cost plus the cost of any improvements made). See I.R.C. § 1001(a). Tax on the capital gain can discourage the sale of a house that has appreciated in value. With respect to a principal residence, however,§ 1034 provides a method for deferring the tax on any gain.

In 1951, in the midst of America's post-World War II housing boom, Congress enacted § 1034 to ease the tax burden of moving from one house to another.[3] Several considerations led Congress to decide that taxing the gain realized from the sale of a house is not always fair. First, inflation may cause the appreciation in value. Second, many homeowners roll over the sale proceeds into a new house,

_____

[3] The section was originally numbered § 112(n). It was renumbered § 1034 when the Code was revised in 1954. For a discussion and critique of various actions by Congress to promote America's housing expansion before and after World War II, see Kenneth Jackson, Crabgrass Frontier: The Suburbanization of the United States 190-218, 231-45 (Oxford Univ. Press 1985).

4

and recognizing taxable gain on the sale of the old house may force a homeowner to buy a smaller new house or take out a larger mortgage to come up with the cash to pay the capital gains taxes. Third, events such as the arrival of a baby or a change in jobs often dictate the decision to buy a new home. As the House Report for the bill enacting § 1034 explains, "[t]he hardship [of recognizing taxable gain] is accentuated when the transactions are necessitated by such facts as an increase in the size of the family or a change in the place of the taxpayer's employment." H.R. Rep. No. 586 (1951), reprinted in 1951 U.S.C.C.A.N. 1781, 1808 [House Report].

The sale or exchange of property usually triggers taxable gain or loss.[4] Sometimes, however, Congress adds a section to the Code that allows certain transactions to be ignored for tax purposes, deferring recognition of the gain or loss until the occurrence of a later event. The technical term for this is "nonrecognition"; it characterizes Code provisions that avoid the recognition of income for tax purposes even though the taxpayer has realized income in the economic sense of having control over the cash or property received. [5] Section 1034, entitled "Rollover of gain on sale of principal residence," reflects the legislative judgment that it is not always fair to recognize taxable gain

———————————————————————————————————

[4] The income tax operates in large measure as a tax on transactions. See Marvin A. Chirelstein, Federal Income Taxation, A Guide to the Leading Cases and Concepts 72 (7th ed. 1994). Rather than impose a tax on every incremental accretion to economic wealth, the Code waits for an event such as the receipt of a paycheck or the sale of stock before imposing the obligation to pay income tax.

[5] See, e.g., I.R.C.§ 109 (leasehold terminations); I.R.C. § 1031 (like kind exchanges of tangible assets); I.R.C. § 1032 (corporation's exchange of stock for property); I.R.C. § 1033 (involuntary conversions). Nonrecognition applies to certain transactions where "in theory the taxpayer may have realized gain or loss but where in fact his economic situation is the same after as it was before the transaction." Century Elec. Co. v. Commissioner, 192 F.2d 155, 159 (8th Cir. 1951). See generally Boris I. Bittker & Lawrence Lokken, Federal Taxation of Income, Estates and Gifts ¶ 44.1.1 (2d ed. 1990) ("The Code contains numerous nonrecognition provisions covering a wide range of transactions that have little in common except that they have elicited a legislative judgment that the taxpayer's realized gain or loss should not be taxed or deducted when the exchange or other event occurs.").

on the sale of a home. Because Congress decided that buying a replacement home is not an event that deserves recognition of the appreciated value in the house that is sold, § 1034 makes the sale of the old house a nonrecognition event.[6]

Section 1034, like most nonrecognition provisions in the Code, does not provide complete tax relief. It merely defers recognition of taxable gain until a later date. Accordingly, the basis in the new house (normally its cost) is reduced by the amount of gain not recognized. The gain is therefore preserved in the decreased basis in the new house and may be recognized when that house is sold. [7]

_____

[6] The House Report likened many sales and purchases of homes to involuntary conversions, such as the government's condemnation of a home to build a highway. In the early 1950s many middle class home-owners, becoming more secure in the economic prosperity following World War II, were moving their growing families to larger homes in the suburbs or were relocating to take new jobs. See House Report at 1808 ("In these situations the transaction partakes of the nature of an involuntary conversion. Cases of this [involuntary] type are particularly numerous in periods of rapid change such as mobilization[for the Korean War] or reconversion."). Of course, not all decisions to buy a new home are "involuntary" or dictated by events outside the control of the taxpayer. Congress nevertheless determined that limiting nonrecognition to cases in which the taxpayer moved for specified reasons would make the statute too difficult to administer. The legislative history explains,

> This special treatment is not limited to the "involuntary conversion" type of case, where the taxpayer is forced to sell his home because the place of his employment is changed. While the need for relief is especially clear in such cases, an attempt to confine the provision to them would increase the task of administration very much.

Id. at 1809.

[7] Because the value of money decreases over time, it is less burdensome to pay capital gains taxes later rather than sooner. Furthermore, other Code provisions may allow the gain to be avoided altogether. Section 121 allows taxpayers of age 55 and over a one-time election to exclude up to $125,000 of gain on the sale of a principal residence. Or, instead of selling, if the owners pass along the home to their heirs, the heirs receive a step up in basis under § 1014 and any prior appreciation on the home is forever eliminated for income tax purposes. See Marvin A. Chirelstein, Federal Income Taxation: A Guide to the Leading Cases and Concepts 297 (7th ed. 1994).

Section 1034 also reflects a decision to subsidize home ownership, a policy choice found frequently in the Code.[8] By allowing full nonrecognition of gain on the sale of a principal residence if the new house is more expensive, § 1034 encourages homeowners to buy larger homes. The tax deferral also encourages homeowners to buy replacement homes rather than rent.

Subsections (a) and (e) are the operative provisions of § 1034. Subsection (a) effects the nonrecognition aspect of § 1034. It provides:

> If property (in this section called "old residence") used by the taxpayer as his principal residence is sold by him and, within a period beginning 2 years before the date of such sale and ending 2 years after such date, property (in this section called "new residence") is purchased and used by the taxpayer as his principal residence, gain (if any) from such sale shall be recognized only to the extent that the taxpayer's adjusted sales price (as defined in subsection (b)) of the old residence exceeds the taxpayer's cost of purchasing the new residence.

I.R.C. § 1034(a). Therefore, if a taxpayer buys a replacement house within two years before or two years after selling a house, gain is recognized only to the extent that the proceeds are not rolled over into the new house. If the new house costs less than the adjusted sales price of the old one, then the taxpayer recognizes gain up to the difference (and presumably has the cash to pay the tax). If the new house costs more, no gain is recognized at all. Subsection (e) effects the deferral aspect of § 1034. Section 1034(e) provides:

> Where the purchase of a new residence results, under subsection (a) or under section 112(n) of the Internal Revenue Code of 1939, in the nonrecognition of gain on the sale of an old residence, in determining the adjusted basis of the new residence as of any time following the sale of the old residence, the adjustments to basis shall include a reduction

---

**8** See, e.g., I.R.C. § 42 (low-income housing credit); I.R.C. § 163(h)(3) (deductibility of interest payments on mortgages secured by principal residence).

by an amount equal to the amount of the gain not so recognized on the sale of the old residence. For this purpose, the amount of the gain not so recognized on the sale of the old residence includes only so much of such gain as is not recognized by reason of the cost, up to such time, of purchasing the new residence.

I.R.C. § 1034(e). The taxpayer's basis in the new house is thus adjusted downward so that the deferred gain may be recognized when the new house is eventually sold.

Section 1034(g) allows married taxpayers to join forces and take advantage of nonrecognition without a complicated accounting of the dollars contributed and received by each spouse. The only figures needed are the total purchase price of the new home and the total sales price of the old home (less any fixing-up expenses). Subparagraph (g)(1)(B) allows a taxpayer to include her spouse's cost of buying the new residence as her own. See I.R.C.§ 1034(g)(1)(B) ("the taxpayer's cost of purchasing the new residence is the cost (to the taxpayer, his spouse, or both)"). Subparagraph (g)(1)(A) allows a taxpayer to include her spouse's share of the sale proceeds from the old house as her own. See I.R.C. § 1034(g)(1)(A) ("the taxpayer's adjusted sales price of the old residence is the adjusted sales price (of the taxpayer, his spouse, or both)"). Assuming both spouses consent, the built-in gain is rolled over into the new house, and the decrease in basis is allocated between the two spouses. See I.R.C. § 1034(g)(2).[9]

In sum, § 1034(a) is a generous provision that encourages home ownership and makes the sale of a home a nonrecognition event for those who buy replacement homes instead of diverting cash to pay the

_____

[9] Consent of both spouses is necessary because § 1034(g) allows shifting of potential gains from one spouse to another. For example, a spouse who held the old home individually while it appreciated in value would, in the normal course, be responsible for all of the income tax due on that appreciation when the house is sold and the gain recognized. Upon purchase of the new house and the invocation of § 1034(g), however, each spouse's basis is decreased equally to account for the unrecognized gain, and half of the potential gain is thereby shifted to the other spouse. See Treas. Reg. § 1.1034(f)(3), example (1).

8

capital gains taxes. Section 1034(g) gives married couples a chance to take advantage of the tax deferral by letting them join forces when buying a new home. With this understanding of § 1034, we can turn to Mrs. Snowa's circumstances and decide whether the section applies to her.

III.

The issue in this case is whether a taxpayer calculating the cost of a new home for tax purposes under § 1034 may include the amount her spouse paid as her own "cost" even though she sold the old home with a different spouse. When the section was drafted in 1951, it appears that no one considered how it would apply to taxpayers who divorce and remarry during the two-year replacement period. Based on our reading of the Code and the relevant policy judgments built into §§ 1034(a) and (g), we believe § 1034(g) allows the newly married couple to be treated as a single economic unit, so Mrs. Snowa may count Mr. Snowa's contribution as her own "cost" for purposes of § 1034.

Mrs. Snowa wants to roll over the gain from the sale of her Westminster house (sold with her ex-husband) into her replacement house in Jamestown (bought with her new husband). At issue is the operation of § 1034(a), which states that gain shall be recognized only to the extent that the taxpayer's "adjusted sales price" exceeds the taxpayer's "cost." I.R.C. § 1034(a). The IRS does not dispute that Mrs. Snowa's adjusted sales price is her one-half share of the proceeds from the sale of her old residence ($178,056). The IRS disagrees, however, with Mrs. Snowa's argument that under § 1034(g) her "cost of purchasing the new residence" is the entire purchase price of the new residence ($180,668).

The IRS contends that Mrs. Snowa's cost is only one-half of the purchase price of the new residence ($90,334). Regulation § 1.1034-1(f) states that subsection (g) applies only if both houses were used as principal residences by the "taxpayer and his same spouse." Treas. Reg. § 1.1034-1(f) (emphasis added). Mr. Snowa and Mr. Spivey are, of course, not the same spouse. Mrs. Snowa argues, however, that the regulation is an impermissible interpretation of the statute and is not a proper exercise of the Treasury's authority to interpret the Code.

9

The IRS has issued no revenue rulings on this issue, and no cases in this circuit or elsewhere address the validity of Treasury regulation § 1.1034-1(f). We explain below why we agree with Mrs. Snowa that the "same spouse" requirement of Treasury regulation § 1.1034-1(f) is invalid.

A.

The Supreme Court has set forth a two-step process to guide judicial review of an agency regulation that construes a statute. First, we must determine whether the statute directly addresses the precise issue before us. "If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress." Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837, 842-43 (1984); see also United States v. Jefferson-Pilot Life Ins. Co., 49 F.3d 1020, 1022 (4th Cir. 1995). Second, if the statute is silent or ambiguous in expressing congressional intent, we must determine whether the agency's interpretation is based on a "permissible construction of the statute." Chevron, 467 U.S. at 843; see also Jefferson-Pilot, 49 F.3d at 1022.

In applying the first step of the Chevron analysis, we conclude that § 1034(g) is ambiguous on the issue presented in this case. Paragraph (g) provides in relevant part:

> (g) Husband and wife.
>
> If the taxpayer and his spouse, in accordance with regulations which shall be prescribed by the Secretary pursuant to this subsection, consent to the application of paragraph (2) of this subsection, then--
>
> (1) for purposes of this section--
>
> (A) the taxpayer's adjusted sales price of the old residence is the adjusted sales price (of the taxpayer, or of the taxpayer and his spouse) of the old residence, and

10

(B) the taxpayer's cost of purchasing the new residence is the cost (to the taxpayer, his spouse, or both) of purchasing the new residence (whether held by the taxpayer, his spouse, or the taxpayer and his spouse); and

(2) so much of the gain on the sale of the old residence as is not recognized solely by reason of this subsection, and so much of the adjustment under subsection (e) to the basis of the new residence as results solely from this subsection shall be allocated between the taxpayer and his spouse as provided in such regulations.

This subsection shall apply only if the old residence and the new residence are each used by the taxpayer and his spouse as their principal residence.

On its face, paragraph (g)(1) seems to allow exactly what Mrs. Snowa needs: to use her share of the proceeds from the sale of the old residence as the "adjusted sales price" and to use both her share and Mr. Snowa's share of the cost as the "cost of purchasing the new residence." By italicizing the words that apply to Mrs. Snowa and her current spouse and by adding some language for clarification, we see how paragraph (g)(1) operates, according to her:

If the _taxpayer and [her] spouse_ [consent to the decrease in basis, then] (1)(A) the taxpayer's adjusted sales price of the old residence is the adjusted sales price (_of the taxpayer_, or of the taxpayer and [her] spouse) of the old residence, and (B) the taxpayer's cost of purchasing the new residence is the cost (to the taxpayer, [her] spouse, _or both_) of purchasing the new residence (whether held by the taxpayer,[her] spouse, or the _taxpayer and [her] spouse_ )[.]

I.R.C. § 1034(g) (emphasis added). Mrs. Snowa does not have to stretch the meaning of any of the words of paragraph (g)(1). Mrs. Snowa is the "taxpayer" and Mr. Snowa is her "spouse;" the "taxpayer" and her "spouse" consented; the adjusted sales price of the Westminster residence is the adjusted sales price of the "taxpayer";

11

and the cost of the Jamestown residence is the cost to "both" the taxpayer and her spouse. Mrs. Snowa fits within the operative language of § 1034(g).

The IRS does not dispute Mrs. Snowa's reading of paragraph (g)(1), but it points to the flush language[10] that follows, which states, "This subsection [g] shall apply only if the old residence and the new residence are each used by the taxpayer and his spouse as their principal residence." I.R.C. § 1034(g). This sentence, the IRS argues, suggests that the taxpayer must be married to the <u>same</u> spouse when both buying the new residence and selling the old residence. The sentence refers to a "taxpayer and <u>his</u> spouse," not a "taxpayer and his spouse<u>s</u>" or a "taxpayer and <u>a</u> spouse." Mrs. Snowa still might fit into the statute, however. Each residence was lived in by the taxpayer (Mrs. Snowa) and her spouse, albeit a different spouse in each. The statute is therefore ambiguous.

Because Congress has not spoken directly to the issue, we must turn to step two of the <u>Chevron</u> analysis and consider whether the Treasury's interpretation is based on a permissible construction of the statute. <u>See Chevron</u>, 467 U.S. at 845; <u>Jefferson-Pilot</u>, 49 F.3d at 1022. Regulation § 1.1034-1(f) provides in relevant part, "Such consent may be filed only if the old residence and the new residence are each used by the <u>taxpayer and his same spouse</u> as their principal residence." Treas. Reg. § 1.1034-1(f)(1) (emphasis added). This regulation, unlike the flush language in the statute, clearly requires that the taxpayer must live in both residences with the same spouse. The regulation does not explain why it interprets the statute as excluding taxpayers who remarry during the two-year replacement period.

Our standard of review in determining whether an agency's regulation is valid depends on whether the regulation is legislative or interpretive. A regulation promulgated in the following circumstance is legislative: "If Congress has explicitly left a gap for the agency to fill,

_____

[10] The phrase "flush language" refers to language that is written margin to margin, starting and ending "flush" against the margins. Flush language applies to the entire statutory section or subsection, in this case subsection 1034(g). <u>See Reser v. Commissioner</u>, 112 F.3d 1258, 1262 n.10 (5th Cir. 1997).

12

there is an express delegation of authority to the agency to elucidate a specific provision of the statute by regulation." Chevron, 467 U.S. at 843-44. Legislative regulations are to be given"controlling weight unless they are arbitrary, capricious, or manifestly contrary to the statute." Id. at 844. Interpretive regulations, on the other hand, clarify ambiguous terms found in the statute or explain how a provision operates. Interpretive regulations are accorded "considerable weight," id., and should be upheld if they implement the congressional mandate in a reasonable manner. National Muffler Dealers Ass'n, Inc. v. United States, 440 U.S. 472, 476 (1979); Schuler Indus., Inc. v. United States, 109 F.3d 753, 754 (Fed. Cir. 1997). See also Reich v. New York, 3 F.3d 581, 586 (2d Cir. 1993) ("[T]he respect accorded the Secretary's interpretive regulations depends upon their persuasiveness; and we will accept that interpretation to the extent it assists us in applying the statute and the legislative rules.") (citing pre-Chevron cases).

The IRS argues that Treasury regulation § 1.1034-1(f) is a legislative regulation and that the same spouse requirement must be given controlling weight. We disagree. Congress left a gap in the statute concerning how to file consent, and Congress directed the agency to fill that gap. It did not, however, leave an explicit gap in the statute as to who may qualify as a spouse. Section 1034(g) begins, "If the taxpayer and his spouse, in accordance with regulations which shall be prescribed by the Secretary pursuant to this subsection, consent to the application of paragraph (2) . . . ." I.R.C.§ 1034(g). The IRS argues that this language gives the Secretary of the Treasury "responsibility for interpreting" § 1034(g). Brief for Appellee at 46. This argument overstates the delegation of rulemaking authority here. The statutory language at the beginning of § 1034(g) instructs the Treasury to promulgate regulations outlining the administrative requirements a taxpayer and spouse must comply with to file their consent to the allocation of the decrease in basis. Consent is necessary because, when the basis in the new home is adjusted downward, part of the taxpayer's deferral becomes the spouse's future taxable gain. Congress instructed the Treasury to come up with rules ensuring that each spouse consents and delegated the authority to determine how, when, and where the form acknowledging consent must be filed. See Treas. Reg. § 1.1034-1(f)(2) ("Such consent shall be filed with the district director with whom the taxpayer filed the return for the tax-

13

able year or years in which the gain from the sale of the old residence was realized."); I.R.S. Form 2119 (Sale of Your Home). Congress did not, however, delegate the power to determine who gets to file for consent to the allocation of basis. That determination was made by Congress in the statutory language, "taxpayer and his spouse." Thus, Treasury Regulation § 1.1024-1(f)(1), which imposes the same spouse requirement, is not a legislative regulation, and we do not accord it controlling weight.

B.

The regulation is still entitled to considerable deference. The Secretary of the Treasury has the general authority to promulgate "all needful rules and regulations for the enforcement of" the Internal Revenue Code. I.R.C. § 7805(a). Treasury regulation§ 1.1034-1(f) interprets the flush language of § 1034(g), and like any other interpretive regulation must be given considerable weight. Specifically, we must defer to Treasury regulation § 1.1034-1(f) if it"implements the congressional mandate in a reasonable manner." National Muffler, 440 U.S. at 476 (1979); see Chevron, 467 U.S. at 844 (stating that in the case of an interpretive regulation "a court may not substitute its own construction of a statutory provision for a reasonable interpretation made by the administrator of an agency") (emphasis added). For the reasons that follow, we conclude that the "same spouse" requirement does not implement the congressional mandate in a reasonable manner, and we agree with Mrs. Snowa that a taxpayer need not be married to the same spouse to take advantage of § 1034(g).

The congressional aim behind § 1034(g) was to treat family finances as being run from a single pocketbook. This was necessary to ease the burden married taxpayers face when buying a replacement home. Thus, § 1034(g) allows a married couple to join forces when buying a home without worrying about who pays for the new house, who signs the mortgage note, or who held title to the old house under state law.[11] All Mrs. Snowa wants to do in this case is take advantage

_____

[11] See Boris I. Bittker & Lawrence Lokken, Federal Taxation of Income, Estates and Gifts ¶ 44.5.2 (2d ed. 1990) (noting that § 1034(g) "allows a married couple to combine forces in applying § 1034. . . .

14

of the single family pocketbook principle by including in her own "cost" the amount paid by Mr. Snowa with cash or loan proceeds. We believe the language of § 1034(g)(1)(B) allows her to do this. See I.R.C. § 1034(g)(1)(B) ("the taxpayer's cost of purchasing the new residence is the cost (to the taxpayer, his spouse, or both) of purchasing the new residence (whether held by the taxpayer, his spouse, or the taxpayer and his spouse)").

The legislative history suggests that the Treasury's authority in implementing § 1034(g) is limited to treating the family pocketbook as a single unit:

> Regulations will be issued under which the taxpayer and his spouse acting singly or jointly may obtain the benefits of [§ 1034] even if the spouse who sold the old residence was not the same as the one who purchased the new one, or the rights of the spouses in the new residence are not distributed in the same manner as their rights in the old residence.

House Report at 1810. Congress thus directed the Treasury to write permissive regulations allowing spouses to roll over the gain regardless of the form of the transaction, not restrictive regulations narrow-

_____

[G]ain on a sale of an old residence by either spouse qualifies for nonrecognition even if the new residence is purchased by the other spouse[.]"). By allowing a married taxpayer to include her spouse's cost as her own, § 1034(g) allows full rollover of gains even if her individual "cost" (the amount of cash and debt actually contributed to the purchase) does not exceed her "adjusted sales price" (sale proceeds she would be deemed to receive from the sale of the old house under state law). Section 1034(g) thus provides a legislative exception to the general rule that a taxpayer cannot recharacterize a transaction to avoid the tax consequences of the form of the transaction actually chosen. Compare Signet Banking Corp. v. Commissioner, ___ F.3d ___, slip op. at 5 (4th Cir. July 8, 1997) (stating general rule that "`while a taxpayer is free to organize his affairs as he chooses, nevertheless, once having done so, he must accept the tax consequences of his choice, whether contemplated or not, and may not enjoy the benefit of some other route he might have chosen to follow but did not.'") (quoting Commissioner v. National Alfalfa Dehydrating & Milling Co., 417 U.S. 134, 149 (1974)).

15

ing the definition of spouse. The House Report continues, "These regulations will apply only if the spouses consent to their application and both old and new residence are used by the taxpayer and his spouse as their principal residence." Id. This sentence indicates that Congress only wanted to place two restrictions on the family pocketbook principle. First, as discussed earlier, there is the "consent" requirement to ensure that both spouses agree on the decision to roll over the gain. Second, there is a "principal residence" requirement in the flush language which prevents taxpayers from rolling over the gain from a vacation home into a new residence. We believe, therefore, that the flush language the IRS relies on so heavily has nothing to do with the definition of "taxpayer and his spouse." The Treasury's same spouse requirement conflicts with the family pocketbook principle and is not a valid exercise of the Treasury's authority to interpret the Code.

Tax policy considerations confirm that excluding taxpayers who remarry within the two-year replacement period conflicts with the congressional mandate. Remarried taxpayers and their children need adequate homes as much as anyone else. If remarried taxpayers are allowed to take advantage of § 1034(g), it gives them a better chance to buy a new house and to establish as soon as possible a stable home environment for children joining them from a prior marriage. But the Treasury's "same spouse" exclusion may force divorced parents who remarry to buy a smaller home or rent so that they have the cash to pay the capital gains tax on the sale of a house owned with a former spouse. This exclusion of remarried taxpayers cannot be what Congress had in mind when it said that the old home and the new home must each be used by the "taxpayer and his spouse" as a principal residence. I.R.C. § 1034(g) (flush language).

State property law also supports Mrs. Snowa's construction of the statute. Mrs. Snowa overstates her case a bit, arguing that because she holds title to the Jamestown residence as a tenant by the entirety (and thus holds an undivided interest in the property), the entire cost of the property is her "cost" for purposes of § 1034(a). Her theory does not make sense under subsection (a) alone, because it would create a windfall capital loss on the subsequent resale of the home.[12] Both Mr.

_____

12 Suppose each spouse has a "cost" of $180,000 and a corresponding cost basis of $180,000. Mrs. Snowa correctly observes that she would not

16

and Mrs. Snowa contributed some money to the purchase, but the fiction of property law which tells us that they each hold an undivided interest does not mean that they each paid $180,000 for a single $180,000 home. Nevertheless, the fact that the Snowas hold the property as tenants by the entirety under state law does support the argument that subsection (g) applies. The Snowas each hold an undivided interest in the property, which may have encouraged them to pay for it together. Subsection (g), entitled "Husband and Wife," encourages this sort of joint marital purchase. It presumes that a married couple acts together as one financial unit and allows a spouse to include the other's cost as his or her own.

The IRS admits that if Mrs. Snowa had simply structured the transaction differently, she could have been responsible for the whole "cost" under § 1034(a) and would not have to rely on § 1034(g). For example, she could have paid the entire balance from a separate bank account and had her husband guarantee the mortgage note instead of co-signing. Requiring such technical structuring would add another layer of complexity to buying a home, which is complicated enough as it is. We believe the IRS's suggestion that Mrs. Snowa should have structured the transaction differently is misguided. Congress enacted § 1034(g) to encourage married couples to pay for new homes together and to relieve them from exactly this kind of complex and needless maneuvering.[13]

_____

recognize gain under § 1034(a) because the cost of the new house exceeds her share of the adjusted sales price of the old house. Without a further adjustment, however, a basis problem arises which would give Mrs. Snowa a windfall capital loss in the future. If the new house is resold for its purchase price of $180,000 and each spouse receives half the sales proceeds, each spouse would receive a $90,000 capital loss ($180,000 - $90,000), less the amount of gain rolled over from the old home under § 1034(e). Section 1034(g) allows each spouse to use a "cost" of $180,000, but solves the basis problem by requiring spouses to allocate the cost basis between them. See I.R.C. § 1034(g)(2), clause 2; Treas. Reg. § 1.1034-1(f)(3), example (1).

[13] We note that more recent amendments to § 1034(g) suggest that Congress intended "taxpayer and his spouse" to be interpreted broadly. In 1988 Congress added a sentence at the end of § 1034(g) which provides

17

We hold, therefore, that a taxpayer who has divorced and remarried may take advantage of § 1034(g) and need not have lived in both the old home and the new home with the same spouse. Mrs. Snowa resided in both her old residence and new residence with her "spouse" even though the spouse was Mr. Spivey in the old residence and Mr. Snowa in the new one.

C.

We are mindful that courts have historically given considerable deference to the Treasury's interpretation of the Internal Revenue Code. See, e.g., Bob Jones Univ. v. United States, 461 U.S. 574, 596-97 (1983); United States v. Correll, 389 U.S. 299, 307 (1967) ("The role of the judiciary in cases of this sort begins and ends with assuring that the Commissioner's regulations fall within his authority to implement the congressional mandate in some reasonable manner."). We do not mean to throw that venerable practice into doubt. As we discussed above, a Treasury regulation must be accepted as a proper exercise of delegated lawmaking authority if the regulation fills an explicit gap left to the agency by Congress or if the regulation interprets an ambiguous Code section in a reasonable manner. See Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837, 842-43 (1984). Some ambiguity in a statute as complex as the Internal Revenue Code is inevitable. Deference to the Treasury allows that agency to make sensible rules clarifying the Code so that taxpayers do not have to take pot luck in the courts with every return. Correll, 389 U.S.

_____

that if one spouse dies before buying a replacement home, the deceased spouse will be deemed to consent to the allocation in basis. The IRS argues that Congress "presumably was aware of the distinction between an intervening death and an intervening divorce, yet it chose not to extend the statute that far." Brief for Appellee at 44. The IRS also argues that because the Treasury's "same spouse" requirement has been in place since 1953, the regulation should be deemed to have received congressional approval. See id. at 48. There is no reason to believe, however, that Congress considered the issue before us. The IRS's legislative reenactment argument notwithstanding, we believe the 1988 amendment relaxing the consent requirement simply confirms that Congress intends § 1034(g) to apply broadly to any taxpayer who wishes to include a spouse as part of a single economic unit.

18

at 302. Nevertheless, the courts must retain the role of ensuring that the Treasury operates within the proper scope of its authority. In the unusual case when a regulation contradicts the plain meaning of the Code or fails to implement the congressional mandate in a reasonable manner, we cannot defer to the Treasury because that would violate our fundamental authority and duty to say what the law is. See Marbury v. Madison, 5 U.S. (1 Cranch) 137, 177 (1803); Henry P. Monaghan, Marbury and the Administrative State, 83 Colum. L. Rev. 1, 26-28 (1983). This is one of those unusual cases.

D.

Because § 1034(g) applies, Mrs. Snowa may include Mr. Snowa's cost as her own. Her cost of the new house (including Mr. Snowa's share) is $180,688. See I.R.C. § 1034(g)(1)(B). Her share of the proceeds from the old house is $178,056. See I.R.C. § 1034(g)(1)(A). Because the cost of the new house exceeds her share of the proceeds from the old house, Mrs. Snowa recognizes no gain. See I.R.C. § 1034(a). The amount of gain not recognized is $69,518, see I.R.C. § 1001(a), and Mr. and Mrs. Snowa must each adjust their basis downwards by one-half this amount ($34,759) to reflect the rollover of gain. See I.R.C. § 1034(g)(2); Treas. Reg. § 1.1034-1(f)(3), example (1).

IV.

We agree with Mrs. Snowa that the "same spouse" requirement of Treasury regulation § 1.1034-1(f)(1) conflicts with the congressional mandate and hold that a taxpayer need not live in both the old residence and new residence with the same spouse to qualify under § 1034(g). Mrs. Snowa is entitled to use § 1034(g) and may properly roll over the gain from the sale of her old residence into her new residence. Accordingly, the judgment of the tax court is

REVERSED.

19