United States Court of Appeals,

Fifth Circuit.

No. 94-40709.

John C. and Jean P. SMITH, Petitioners-Appellants,

v.

COMMISSIONER OF INTERNAL REVENUE, Respondent-Appellee.

Sept. 25, 1995.

Appeal from the Tax Court of the United States.

Before POLITZ, Chief Judge, REAVLEY and EMILIO M. GARZA, Circuit Judges.

POLITZ, Chief Judge:

John C. and Jean P. Smith, husband and wife, appeal the judgment of the tax court determining a deficiency of $123,930 in their joint income tax for 1987. We affirm.

*Background*

In 1981 John Smith and Robert L. Bennett incorporated Smith-Bennett Properties, Inc. for the purchase and development of real estate. Three years later the corporation and several other investors formed a joint venture, Spicewood Springs Venture, to purchase and develop an 11.4 acre tract of undeveloped property. The venture purchased the tract from Austin Financial Corporation, a corporation owned by Gary Bird, giving in payment a $367,314 note to Bird, secured by a second mortgage on the property, and assuming the balance of an outstanding $750,000 priming mortgage note held by United Bank of Texas. All venture participants gave personal guaranties for the assumed note.

Smith eventually became the sole shareholder in the Smith-

1

Bennett corporation which, ultimately, became the sole member of the Spicewood joint venture. The restructuring resulted in Smith becoming the sole guarantor of the assumed mortgage note.

In 1986 the value of the Spicewood property declined precipitously. In 1987 Smith informed United Bank that neither he nor the venture could pay the note. He suggested that United Bank foreclose on the property and, after obtaining financing from another lender, he proposed to satisfy the indebtedness by bidding the amount of his guaranty at the foreclosure sale. United Bank agreed to this plan and Smith sought financing from First City National Bank of Austin for the approximate $750,000 owed on the note.

In April 1987 United Bank instituted foreclosure proceedings. A problem developed when First City refused to complete the loan primarily because of the unavailability of title insurance due to the legal concern that Smith's purchase at the foreclosure sale would not eliminate Bird's security position on the property. On May 5, 1987 Smith placed the joint venture into Chapter 11 bankruptcy, thus terminating the foreclosure proceedings. Within a matter of days United Bank was taken over by the Federal Deposit Insurance Corporation.

Smith successfully sought a public sale of the Spicewood tract by the bankruptcy court, a sale which, by its terms, would leave the property free of all encumbrances. Smith also received court approval to bid personally on the property. As such a sale would cancel the Bird lien and allay concerns of title insurers, and

2

secure for First City a priming mortgage position, it agreed to loan Smith $750,000 for his "purchase" of the Spicewood property. Smith submitted the only proposal at the bankruptcy sale, bidding $837,316.40, the exact sum needed to pay the mortgage note assumed by the joint venture. The bankruptcy sale was approved and consummated.

Based on their belief that a significant portion of the bid was an unrecoverable satisfaction of John Smith's guaranty obligation, the Smiths claimed a nonbusiness bad-debt deduction of $637,874 on their 1987 joint income tax return.[1] The Internal Revenue Service rejected the deduction, maintaining that the form of the transaction, a purchase, controlled its characterization for tax purposes, and that any claimed loss was necessarily speculative until resale of the property. The IRS assessed a deficiency of $123,930.43.

The matter was taken to the tax court which rejected the contention that the foregoing scenario constituted the unrecoverable payment of a guaranty and held that regardless of the form of the transaction, its substance was merely the refinancing of the originally assumed mortgage note. The tax court found no actual loss by the Smiths, declined the deduction, and confirmed the deficiency. The Smiths timely appealed.

*Analysis*

The Smiths challenge the adverse ruling of the tax court on

---

[1]The deduction is the difference between the total cost of the bankruptcy sale transaction, $872,874, less a credit of $235,000, the then-estimated worth of the Spicewood property.

their claim of a nonbusiness bad-debt deduction arising out of their acquisition of the Spicewood tract. We review tax court factual findings under the clearly erroneous standard[2] and legal conclusions *de novo.*[3]

Typically, a taxpayer cannot incur a deductible loss upon the mere purchase of property for the transaction, at that point, is open, remaining so until a closure, such as a resale, occurs.[4] When such an event occurs any resulting loss may qualify as an allowable deduction.[5] If the bankruptcy proceeding through which Smith received title is regarded as a sale, the Smiths may not claim a deduction until the property is resold at a loss and they otherwise qualify.

If, on the other hand, the transaction is treated as satisfaction of a guaranty, the Smiths may deduct, as a short-term capital loss, any payment which is nonrecoverable.[6] The deduction is allowed to the extent the taxpayer's satisfaction of a guaranty cannot be recovered from the primary obligor.[7] The Smiths maintain

---

[2]*Curtis v. Commissioner of Internal Revenue,* 623 F.2d 1047 (5th Cir.1980).

[3]*Harris v. Commissioner of Internal Revenue,* 16 F.3d 75 (5th Cir.1994).

[4]26 U.S.C. § 1001 (1994).

[5]*San Antonio Savings Association v. Commissioner of Internal Revenue,* 887 F.2d 577 (5th Cir.1989).

[6]26 U.S.C. § 166(d)(1) (1994).

[7]*Putman v. Commissioner of Internal Revenue,* 352 U.S. 82, 77 S.Ct. 175, 1 L.Ed.2d 144 (1956); *Garner v. C.I.R.,* 987 F.2d 267 (5th Cir.1993).

4

that the amount paid beyond the fair market value of the Spicewood property is not recoverable because of the insolvency of the joint venture and the Smith-Bennett corporation.

A correct characterization of the subject transaction is critical to a proper determination of the tax consequences. It is not meaningfully disputed that the form of the transaction at issue was that of a sale. The Smiths maintain that the form should yield to the substance of the transaction. Considering that the price paid exceeded the fair market value of the property and equaled the amount owed by Smith under his personal guaranty,[8] the Smiths contend that the economic reality of the transaction was satisfaction of the guaranty and they insist that this reality should control the tax consequences.

Although obviously important, the professed economic reality of a transaction is not a "talisman" which blinds the taxing authorities to other relevant factors and dictates the tax consequences.[9] Ordinarily, a taxpayer cannot "avoid the consequences of his agreement by showing that the "economic realities' were otherwise."[10] The rule, rather, is that taxpayers are bound to the form of the transaction that they have chosen, as,

while a taxpayer is free to organize his affairs as he

---

[8]The record contains no evidence that the guaranty was actually invoked.

[9]*Spector v. Commissioner of Internal Revenue,* 641 F.2d 376 (5th Cir.), *cert. denied,* 454 U.S. 868, 102 S.Ct. 334, 70 L.Ed.2d 171 (1981).

[10]*Id.* at 386, citing *Harvey Radio Lab., Inc. v. Commissioner of Internal Revenue,* 470 F.2d 118, 120 (1st Cir.1972).

5

chooses, nevertheless, once having done so, he must accept the tax consequences of his choice, whether contemplated or not, and may not enjoy the benefit of some other route he might have chosen to follow but did not.[11]

As an exception to this rule, a taxpayer may argue substance over form "when necessary to prevent unjust results,"[12] and when proof is offered "which in an action between the parties would be admissible to alter that construction or to show its unenforceability because of mistake, undue influence, fraud, duress, etc."[13]

---

[11]*Commissioner of Internal Revenue v. National Alfalfa Dehydrating & Milling Co.,* 417 U.S. 134, 94 S.Ct. 2129, 40 L.Ed.2d 717 (1974).

[12]*Adobe Resources Corp. v. United States,* 967 F.2d 152, 156 (5th Cir.1992).

[13]*Spector,* 647 F.2d at 382, citing *Commissioner of Internal Revenue v. Danielson,* 378 F.2d 771, 775 (3d Cir.), *cert. denied,* 389 U.S. 858, 88 S.Ct. 94, 19 L.Ed.2d 123 (1967). The Smiths argue that *Spector's* requirement of agreement-varying proof is inapplicable to "situations in which the government will never face conflicting claims." *Comdisco, Inc. v. United States,* 756 F.2d 569, 578 (7th Cir.1985). They claim that, as the other party to this transaction was a government agency (the FDIC, acting as recipient of the funds generated from the sale), there is no threat of two conflicting characterizations of the transaction allowing both parties to obtain favorable tax treatment, thus defeating tax payment.

We are not persuaded. The spectre of the conflicting claims exists herein. The record reflects that Smith-Bennett's 1987 tax return contained a deduction for a capital loss arising from a *sale* of the Spicewood property for $560,000. Although the Smiths now claim this entry to be a mistake, it had the net effect of creating a now-uncollectible tax deficiency that inured to Smith's benefit as sole stockholder. *See* 26 U.S.C. § 6501(a) (1994). Thus, as there already have been conflicting constructions of the transaction so as to receive favorable tax treatment for both, the threat of a whipsaw has already materialized, rendering *Spector's* proof requirement applicable.

6

The record contains no admissible proof sufficient to vary the form of the instant agreement. The Smiths do not demonstrate any conditions that render the sale agreement involuntary. Claiming that they styled this transaction a purchase only to obtain financing necessary to pay the pending guaranty, the Smiths essentially argue that economic duress compelled their choice of the form. To show economic duress sufficient to warrant the ignoring of the form, the Smiths must prove wrongful acts causing their financial distress and effectively coercing their use of the purchase form.[14] The record before us contains no wrongful acts committed by any other party connected to the court-ordered sale, let alone any leading to Smith's unwilling entry into this sales transaction. Indeed, the record supports the tax court's finding that Smith actively pursued a voluntary purchase arrangement which was quite advantageous. No unjust results accrued to the Smiths by their being bound to the form of this transaction.[15]

We also agree with the tax court's conclusion that in obtaining the property at a court-ordered public sale Smith

[14]*See Palmer Barge Line v. So. Petroleum Trading Co.,* 776 F.2d 502 (5th Cir.1985) (applying Texas law); *Lee v. Hunt,* 631 F.2d 1171 (5th Cir.1980), *cert. denied,* 454 U.S. 834, 102 S.Ct. 133, 70 L.Ed.2d 112 (1981) (applying Texas law); *Tower Contracting Co., Inc. of Tex. v. Burden Bros., Inc.,* 482 S.W.2d 330 (Tex.Civ.App.—Dallas 1972, writ ref'd n.r.e.).

[15]The Smiths also contend that a taxpayer may invoke substance over form where "his tax reporting and actions show an honest and consistent respect for the substance of the transaction." *Weinert's Estate v. Commissioner of Internal Revenue,* 294 F.2d 750, 755 (5th Cir.1961). Considering their inconsistent reporting of the disputed transaction in their personal and corporate tax returns, the Smiths' reliance upon *Weinert* is misplaced.

improved his position as owner of the property. The court correctly noted that because of his sole control over both Smith-Bennett and the joint venture, Smith was the *de facto* owner of the property during this entire scenario. By the purchase in his individual capacity at the bankruptcy sale he transformed his *de facto* ownership into the superior *de jure* ownership. Further, Smith's decision to cast this transaction as a purchase conferred the additional beneficial effect of washing out Bird's $367,000-plus lien which would have reduced the value of his ownership dramatically.

Even assuming that Smith's sole motivation was payment of the pending guaranty, his use of the bankruptcy sale legal vehicle made it possible for him to get the financing required to satisfy that obligation. The record reflects that in light of his precarious economic position, the obtaining of a loan from First City was essential to payment of the guaranty. As a direct result of the cancellation of the Bird mortgage position via the bankruptcy sale, the concerns of the title insurer were assuaged and title insurance became available. It was only then that First City agreed to loan Smith the funds necessary for the purchase and for the concomitant elimination of the potentially ruinous personal liability that the guaranty agreement posed.

Smith's "purchase" also resulted in a favorable change in the terms of indebtedness relating to his guaranty. Under the terms of the guaranty and the note it secured, Smith would have been required to pay upon demand after acceleration of the principal

obligation, including over 15% interest. By using the bankruptcy sale process, Smith was able to obtain a loan from First City that replaced his guaranty obligation with an obligation providing a longer repayment term at a lower interest rate. Further, by this substitution Smith escaped the contractual liability for added costs inherent in collection of the guaranty.

Finally, Smith's use of the bankruptcy sale process allowed him to circumvent the costly and dilatory state procedures required for a guarantor to receive title to immovable property securing the principal obligation. United Bank, and the successor FDIC, had, under the terms of the mortgage note, the right to demand payment and to foreclose upon the Spicewood property when the joint venture failed to pay as agreed. Under basic principles of subrogation, if the guaranty had been formally invoked and satisfied, Smith would have possessed these rights.[16] By purchasing the property at the bankruptcy sale he received a benefit unavailable to a subrogating guarantor, i.e., the immediate receipt of title without resort to time-consuming foreclosure, at which Smith, just as any other similarly-situated mortgagee, would have been required, after due notice, to bid the amount owed pursuant to his guaranty before receiving title.[17]

Being persuaded beyond peradventure that the benefits

---

[16]*Farm Credit Bank of Texas v. Ogden,* 886 S.W.2d 305 (Tex.App.—Houston [1st Dist.] 1994, no writ).

[17]*See, e.g., Tarrant County Savings Association v. Lucky Homes, Inc.,* 390 S.W.2d 473. (Tex.1965); *Sandel v. Burney,* 714 S.W.2d 40 (Tex.App.—San Antonio 1986, no writ).

surrounding Smith's decision to structure this transaction as a purchase demonstrate that "reasonable men, genuinely concerned with their economic future, might bargain for such an agreement,"[18] we find no unjust results that require derogation from the well-settled rule that the form of a transaction controls its tax consequences. The equities militate against the Smiths. No capital loss-based deduction may be claimed until the property is resold and the requisite elements for that deduction are met and the Smiths appropriately qualify.

Accordingly, the judgment of the tax court disallowing the deduction and finding a $123,930 deficiency in the Smiths' 1987 tax is AFFIRMED.

---

[18]*Sonnleitner v. Commissioner of Internal Revenue,* 598 F.2d 464, 467 (5th Cir.1979).