PUBLISHED

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

UNITED STATES OF AMERICA,

　　　　　　*Plaintiff-Appellee,*

v.

ROBERT L. BERGBAUER; MARIE T. BERGBAUER,

　　　　　　*Defendants-Appellants.*

No. 08-2054

Appeal from the United States District Court
for the District of Maryland, at Baltimore.
Richard D. Bennett, District Judge.
(1:05-cv-02132-RDB)

Argued: January 28, 2010

Decided: April 16, 2010

Before MOTZ, SHEDD, and AGEE, Circuit Judges.

Affirmed by published opinion. Judge Agee wrote the opinion, in which Judge Motz and Judge Shedd joined.

## COUNSEL

**ARGUED**: Julian Spirer, Bethesda, Maryland, for Appellants. Francesca Ugolini Tamami, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Appellee. **ON BRIEF:** Mark L. Rosenberg, Bethesda, Maryland, for Appel-

lants. John A. DiCicco, Acting Assistant Attorney General, Kenneth L. Greene, Tax Division, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C.; Rod J. Rosenstein, United States Attorney, Baltimore, Maryland, for Appellee.

---

**OPINION**

AGEE, Circuit Judge:

Robert and Marie Bergbauer appeal from the grant of summary judgment to the Government establishing their federal income tax liability. The district court held that Robert Bergbauer's sale of his interest in a subsidiary of Ernst & Young LLP ("Ernst & Young") was a fully taxable event in the year 2000. For the reasons set forth below, we affirm the judgment of the district court.

I.

A.

In 1999, Ernst & Young LLP ("Ernst & Young") entered into a letter of intent to sell its consulting business to Cap Gemini, S.A. ("Cap Gemini"). The parties agreed that Ernst & Young would transfer the assets of the consulting division of its business to a newly-formed subsidiary, Cap Gemini Ernst & Young US LLC ("CGE&Y"), and thereafter distribute membership interests in CGE&Y primarily to those partners in Ernst & Young, like Robert Bergbauer, who worked in the consulting division ("the consulting partners"). Immediately following the distribution, Ernst & Young and the consulting partners would sell their CGE&Y membership interests to Cap Gemini in exchange for Cap Gemini common stock. As a result, Cap Gemini would own all the equity inter-

ests of CGE&Y and operate the former Ernst & Young consulting practice through that entity.[1]

Ernst & Young distributed a Partner Information Document ("PID") to the consulting partners which described the proposed transaction.[2] The PID indicated that the exchange of CGE&Y membership interests for Cap Gemini stock would be structured as a "taxable capital gains transaction," in which the "partners are treated as though they receive all of the gain and are taxed on it." J.A. 285. The PID also provided that "[a]ll partners will vest in their shares immediately upon closing. However, the shares . . . will be subject to forfeiture" under certain circumstances. J.A. 280. The Cap Gemini shares received would not be directly distributed to the consulting partners, but would "be held in an individual account in an institution such as . . . Merrill Lynch and [would] be subject to resale restrictions." J.A. 278.

Twenty-five percent of each consulting partner's Cap Gemini shares would be released for sale shortly after the transaction closed, so the consulting partner could cover the 2000 tax liability incurred as a result of recognizing the receipt of all the Cap Gemini stock as income that year. The remaining seventy-five percent of a partner's shares would be held in a restricted brokerage account for that partner and could be "monetized," that is sold, in installments of up to fifteen percent of the partners' shares on each of the next five anniversary dates of the sale. A consulting partner could not "directly or indirectly, sell, assign, transfer, pledge, [or] grant any option with respect to or otherwise dispose of any interest" in non-monetized shares. J.A. 785. While non-monetized shares

---

[1]The consulting partners would then sever their relationship with Ernst & Young by divesting their partnership interests in Ernst & Young, cashing out their capital accounts, and becoming employees of CGE&Y.

[2]The PID was not a contract document to be executed by the parties, but an informational document somewhat akin to a prospectus for security investments.

were held in the restricted brokerage accounts, those shares were subject to forfeiture "for breach of [partners'] individual Cap Gemini agreements, early departures or termination for cause." J.A. 280. Upon monetization all restrictions on those shares lapsed.

Of particular import for the timing-of-income issue in the case at bar, the PID stated:

> The fair market value of the stock received that cannot be sold immediately will be calculated at 95 percent of the closing price of Cap Gemini stock on the day of the exchange for [CGE&Y] shares. This discount will slightly reduce tax due on the Cap Gemini shares received at closing. . . . Ernst & Young, its partners, and Cap Gemini will treat valuation and related issues consistently for [U.S.] federal income tax purposes. . . .

> For all . . . partners . . . [t]he gain on the sale of the distributed [CGE&Y] shares is reportable on Schedule D of your U.S. federal income tax return for 2000.

J.A. 285-86.

The consulting partners, including Robert Bergbauer, had the opportunity to review the PID before they met on March 7-8, 2000 to discuss and vote on the proposed transaction. During its presentation of the proposed transaction, Ernst & Young's management answered questions regarding the tax implications of the receipt of Cap Gemini stock, particularly the decision to structure the sale "as a taxable transaction on day one" in contrast to "creeping vesting" or "structured vesting." J.A. 495, 500, 501. It was widely anticipated among the parties that the value of Cap Gemini stock would substantially appreciate after closing. Management explained that in order to obtain long-term capital gains treatment on future sales of

Cap Gemini stock, the consulting partners must recognize the value of all the shares as taxable income in 2000, thereby setting the shares' cost basis (Internal Revenue Code ("I.R.C.") § 1012) and the required capital gains holding period (I.R.C. § 1223).[3] Ultimately, ninety-five percent of the consulting partners, including Robert Bergbauer, voted to approve the transaction.

After the consulting partners' vote of approval, Ernst & Young distributed the necessary contract documents to consummate the transaction. These documents included, *inter alia*, the Consulting Partner Transaction Agreement ("CPTA"), the Master Agreement, and a brokerage agreement as to the non-monetized shares (collectively "the transaction documents").

In executing the CPTA, the consulting partners warranted their receipt of Cap Gemini shares would "be a taxable transaction for U.S. federal income tax purposes," but the specific timing language about the year 2000 was not included as it was in the PID. J.A. 782. Certain provisions of the Master Agreement (1) reflected that the Cap Gemini shares "not monetized in the Initial Offering [would] be valued for tax purposes at 95% of the otherwise-applicable market price," J.A. 1047, (2) instructed the parties to treat the transaction as a sale and not to take a contrary position in any tax return without the written consent of Cap Gemini, and (3) stated that neither Cap Gemini nor its affiliates were the legal or beneficial owner of the shares received by the consulting partners.

The CPTA also contained a liquidated damages clause, which provided that consulting partners could be terminated for cause, voluntarily leaving CGE&Y, or breaching the non-compete or confidentiality provisions of their Cap Gemini employment agreements, and be required to forfeit some or all

---

[3]Internal Revenue Code sections directly correspond to those found in Title 26 of the United States Code.

of their non-monetized shares. The percentage of Cap Gemini stock subject to forfeiture depended upon the triggering forfeiture event.[4]

## B.

Robert Bergbauer executed the required transaction documents on May 1, 2000, and received, in exchange for his CGE&Y membership interest, 10,740 shares of Cap Gemini stock subject to the limitations and restrictions noted above.[5] The Bergbauers timely filed their year 2000 federal income tax return consistent with the PID and transaction documents. On Schedule D of their 2000 return, the Bergbauers reported the value of *all* the Cap Gemini shares as taxable income. Twenty-five percent of the shares were valued at the full closing price of $155.30 and the remaining seventy-five percent at ninety-five percent of that value, $148.52.[6]

On each successive anniversary date of the closing, 2,013.75 shares were monetized, that is released, from the restricted brokerage account and made available to Bergbauer for sale. While the non-monetized shares were held in the

---

[4]If an event occurred triggering the forfeiture provision, partners could lose: (a) 100% of their stock before December 31, 2000; (b) 75% of their stock before the first anniversary of the closing; (c) 56.7% of their stock on or after the first anniversary of the closing and before the second anniversary of the closing; (d) 38.4% of their stock on or after the second anniversary of the closing and before the third anniversary of the closing; (e) 20% of their stock on or after the third anniversary of the closing and before the fourth anniversary of the closing; and (f) 10% on or after the fourth anniversary of the closing and prior to the end of the 4-year, 300-day restricted period. If a consulting partner was terminated for "poor performance," up to fifty percent of the prescribed percentage could be forfeited at the discretion of CGE&Y. J.A. 787.

[5]Shortly after the closing, Robert Bergbauer sold twenty-five percent of his Cap Gemini stock and the proceeds were distributed to him.

[6]The Bergbauers' 2000 return reported total capital gain income of $1,515,814, total taxable income of $2,473,832, and a federal income tax liability of $676,493.

restricted brokerage account, Bergbauer received the dividend income attributable to those shares.

In December 2002, CGE&Y terminated Robert Bergbauer's employment as part of a reduction in force following the "dot com bubble burst." J.A. 81. Bergbauer, however, did not forfeit any of his Cap Gemini shares and received a cash severance payment. He later found employment at KPMG where he became a full equity partner.

By 2003, in contrast to the consulting partners' expectations, the Cap Gemini share price had dropped precipitously.[7] Bergbauer and other former Ernst & Young colleagues discussed the prospect of filing amended year 2000 tax returns based on "what had happened to the value of the Cap [Gemini] stock." J.A. 92.

The Bergbauers filed an amended year 2000 federal income tax return in 2003, taking the position that only the twenty-five percent of Cap Gemini shares, those which were monetized and then sold in 2000, were taxable income for that year. Citing the "lack of control over the remaining Seventy-Five (75%) of the stock in the trust," the Bergbauers contended those shares were not taxable in 2000 because Robert Bergbauer "did not receive the stock," but should have been recognized as income only in the years of monetization and valued at the much lower market rates. J.A. 914. The amended return correspondingly reduced the amount of 2000 taxable income, resulting in a claim for a refund of $253,490 plus accrued interest.

---

[7]The drop in share price was reflected by Bergbauer's sale of his monetized Cap Gemini shares: (1) 555 shares at $76.77 in April 2002, netting proceeds of $42,607.06; (2) 4,278 shares at $33.09 in May 2003, netting proceeds of $141,569.00; (3) 2,148 shares at $46.45 in September 2003, netting proceeds of $99,792.51; and (4) 1,074 shares at $24.68 in October 2004, netting proceeds of $26,505.67.

The Internal Revenue Service ("IRS") reviewed the amended return and agreed to abate the Bergbauers' year 2000 tax liability by the requested $253,490. The IRS applied $100,000 as a credit to the Bergbauers' 2001 tax liability and cut a check to them for the remainder plus accrued interest.

Upon further examination, the IRS later determined that the abatement and refund had been made in error. As a result, a civil action was brought against the Bergbauers under I.R.C. § 7405, seeking payment to the Government of the erroneous tax refund. After the parties conducted discovery, the Government filed a motion for summary judgment contending the undisputed facts proved the value of all the Cap Gemini stock was taxable income in 2000 and the tax refund was in error. The Bergbauers responded with a cross-motion for summary judgment, arguing the abatement and refund were not erroneous because only twenty-five percent of the stock was taxable income in 2000.[8]

The district court observed that, when determining the tax treatment of a transaction, the Fourth Circuit "applies a two-pronged test which examines (1) the intent of the parties; and (2) the economic substance of the transaction," *United States v. Bergbauer*, No. 05-2132, 2008 WL 3906784, at *8 (D. Md. Aug. 18, 2008) (citing *Gen. Ins. Agency, Inc. v. Comm'r*, 401 F.2d 324, 327 (4th Cir. 1968)), commonly termed the "economic reality" test. The court determined that the intent prong of the economic reality test showed an intent to recognize the value of all the Cap Gemini stock as taxable income in 2000. *Id.* at *10. The district court also concluded that the parties

---

[8]The district court initially postponed a decision until other district courts considering the same question concerning former Ernst & Young consulting partners had an opportunity to rule. *See United States v. Bergbauer*, No. 05-2132, 2008 WL 3906784, at *4 (D. Md. Aug. 18, 2008). To date, there are more than 200 cases pending in the lower courts or administratively with the IRS in which former Ernst & Young consulting partners have sought to defer their recognition of income from the sale of their CGE&Y interests to Cap Gemini in 2000.

bargained at arms-length for, and received, real economic benefit from treating all the Cap Gemini stock as received for income tax purposes in 2000. *Id.* Accordingly, the district court awarded summary judgment to the Government and denied the Bergbauers' motion. *Id.* at *11.

The Bergbauers noted a timely appeal, and we have jurisdiction pursuant to 28 U.S.C. § 1291.

## II.

We review an award of summary judgment de novo. *Desmond v. PNGI Charles Town Gaming, L.L.C.*, 564 F.3d 688, 691 (4th Cir. 2009). Summary judgment is appropriate only "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c)(2); *Erwin v. United States*, 591 F.3d 313, 327 (4th Cir. 2010). Because the Bergbauers' claims were rejected on summary judgment, we view the factual evidence in the light most favorable to them. *See Walker v. Prince George's County*, 575 F.3d 426, 427 (4th Cir. 2009) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986)).

## III.

This case presents the issue of the timing of the receipt of income: Were the Bergbauers the taxable recipients of all the Cap Gemini shares in 2000 or only the twenty-five percent monetized and available for sale? The Bergbauers do not contest the valuation of the shares, the adequacy of consideration, or challenge the validity of the transaction. They simply contend that the 8,055 non-monetized Cap Gemini shares were not "received," for income tax purposes, in 2000 and therefore should not be "recognized" as income in that year. Citing I.R.C. § 451(a), the Bergbauers argue that cash method taxpayers, like them, should report income in the tax year in

which they actually or constructively receive it. *See* I.R.C. § 451(a) ("The amount of any item of gross income shall be included in the gross income for the taxable year in which received by the taxpayer . . . .").

The Bergbauers posit that Robert was not in actual receipt of the non-monetized shares in 2000 because those shares were held in a restricted account and subject to transfer prohibitions. Citing the regulations under § 451 in 26 C.F.R. § 1.451-2(a), the Bergbauers also argue there was no "constructive receipt" of the non-monetized shares in 2000 because of both the restrictions on transfer and the risk of forfeiture.[9] Br. of Appellant at 20. As further support, the Bergbauers reference I.R.C. § 83(a)(2), which they claim sets the timing of recognition of income as "the first taxable year in which the rights of the person having the beneficial interest in such property are transferable or are not subject to a substantial risk of forfeiture." Br. of Appellant at 28.

Thus, if Robert Bergbauer did not "receive" the non-monetized shares in 2000, the Bergbauers argue they were not required to recognize and report the value of those shares as taxable income that year. Br. of Appellant at 23. Instead, the Bergbauers contend that the non-monetized shares were received, for income tax purposes, *seriatim* in each year after 2000 when the forfeiture restrictions lapsed and the shares were released and available for transfer. Br. of Appellant at 14-15. The Bergbauers conclude that their intention, and that of the other parties, that the "shares be deemed to have been

---

[9]26 C.F.R. § 1.451-2(a) provides in relevant part:

Income although not actually reduced to a taxpayer's possession is constructively received by him in the taxable year during which it is credited to his account, set apart for him, or otherwise made available so that he may draw upon it at any time, . . . . However, income is not constructively received if the taxpayer's control of its receipt is subject to substantial limitations or restrictions. . . .

received sooner for tax purposes could not hasten the taxability of the shares" because § 451 or § 83 foreclose that result. Br. of Appellant at 23.

The Government responds by citing the unanimous decisions from courts in other circuits addressing the claims of similarly situated former Ernst & Young consulting partners, all of which have determined that the value of all the Cap Gemini shares was fully taxable in 2000. *See, e.g.*, *United States v. Fletcher*, 562 F.3d 839 (7th Cir. 2009). Recognizing that decisions from outside this Circuit use different standards in evaluating the recharacterization of a taxable transaction, the Government also argues the district court correctly applied our Court's economic reality test and that the Bergbauers' statutory argument is misplaced. Br. of Appellee at 26-27.

We note that the Bergbauers do not contend the economic reality test is invalid. Instead, the bottom line of their position is that the provisions of § 451 and § 83 supersede any application of that test and mandate their proposed tax treatment of the Cap Gemini stock. We disagree and find the district court properly applied our precedent and committed no error in awarding summary judgment to the Government.

In *Commissioner v. National Alfalfa Dehydrating and Milling Co.*, 417 U.S. 134 (1974), the Supreme Court stated:

> [W]hile a taxpayer is free to organize his affairs as he chooses, nevertheless, once having done so, he must accept the tax consequences of his choice whether contemplated or not, and may not enjoy the benefit of some other route he might have chosen to follow but did not.

417 U.S. at 149 (internal citations omitted); *Signet Banking Corp. v. Comm'r*, 118 F.3d 239, 241 (4th Cir. 1997) (same); *see also Frank Lyon Co. v. United States*, 435 U.S. 561, 583-84 (1978) (holding that "the Government should honor

the allocation of rights and duties effectuated by the parties" when "there is a genuine multiple-party transaction with economic substance . . . compelled or encouraged by business or regulatory realities, . . . imbued with tax-independent considerations, and . . . not shaped solely by tax-avoidance features that have meaningless labels attached"); *id.* at 584 ("Expressed another way, . . . the form of the transaction adopted by the parties governs for tax purposes."); *accord Gray v. Powell*, 314 U.S. 402, 414 (1941) ("The choice of disregarding a deliberately chosen arrangement for conducting business affairs does not lie with the creator of the plan.").

In embracing *National Alfalfa*'s principle, "courts have established very strict standards," *Furman v. United States*, 602 F. Supp. 444, 456 (D.S.C. 1984), for a taxpayer who elects "a specific course of action and then when finding himself in an adverse situation [seeks to] extricate himself by applying the age-old theory of substance over form." *Cornelius v. Comm'r*, 494 F.2d 465, 471 (5th Cir. 1974) (quotation omitted). We have recognized that "[g]enerally, taxpayers are liable for the tax consequences of the transaction they actually execute and may not reap the benefit of recasting the transaction into another one substantially different in economic effect that they might have made." *Estate of Leavitt v. Comm'r*, 875 F.2d 420, 423 (4th Cir. 1989); *see also Signet*, 118 F.3d at 242 ("[T]he bank simply cannot structure the terms of the cardholder agreement to its advantage and then rely on an indeterminate question of Virginia law to evade the federal tax implications thereof."); *Snowa v. Comm'r*, 123 F.3d 190, 198 n.11 (4th Cir. 1997) (observing that § 1034(g) of the Internal Revenue Code "provide[d] a legislative exception to the general rule that a taxpayer cannot recharacterize a transaction to avoid the tax consequences of the form of the transaction actually chosen").

To put it plainly, we have bound taxpayers to "the 'form' of their transaction" when they attempt to recharacterize an otherwise valid agreement bargained for in good faith. *Estate*

*of Leavitt*, 875 F.2d at 423. We have also refused to entertain arguments "that the 'substance' of their transaction triggers different tax consequences." *Id.* This precept not only maintains the vital public policy of enforcing otherwise valid contracts, but also assures the reliability of agreed tax consequences to the public fisc.

"[A]llowing the government to adopt as conclusive a result agreed to by the parties . . . provide[s] a more efficient system that . . . greatly reduce[s] the possibility of litigation . . . aimed at revising the parties' bargained agreement." *Sullivan v. United States*, 618 F.2d 1001, 1004 (3d Cir. 1980); *see also Furman*, 602 F. Supp. at 455 ("To allow a taxpayer to unilaterally reform one end of a bargain could encourage taxpayers to ignore agreements as written in the hope that the courts will give them more advantageous tax treatment."). To do otherwise would allow situations to be created where the alteration of tax benefits, as a result of inconsistent reporting, "whipsaws" the Government and results in disastrous and unfair effects on our tax system. *Sullivan*, 618 F.2d at 1004 (recounting the previous practice of parties "advocat[ing] mutually conflicting tax characterizations of their agreement[s]," which "frequently" would compel the Commissioner "to assess inconsistent deficiencies" and to pursue litigation against both parties "in separate suit[s]," wherein the Commissioner was forced to take "divergent positions so as to avoid two adverse judgments").

There is no "disparity" in allowing "the Commissioner alone to pierce formal" agreements as "taxpayers have it within their own control to choose in the first place whatever arrangements they care to make." *Comm'r v. Danielson*, 378 F.2d 771, 775 (3d Cir. 1967) (en banc). The Government's interest lies "in having the transaction reported consistently by" the parties to the sale. *Throndson v. Comm'r*, 457 F.2d 1022, 1024 n.2 (9th Cir. 1972). In this case, the Government never challenged the Bergbauers' recognition of the value of all 10,740 Cap Gemini shares as taxable income in 2000. All

the other parties to the transaction, including Cap Gemini, reported the stock transfer consistent with the Bergabuers' treatment on the 2000 return and the Commissioner has not challenged those actions.

With the foregoing in mind, our Circuit has applied a two-pronged "economic reality" test when reviewing a taxpayer's attempt to recharacterize the tax consequences of a transaction.[10] *Gen. Ins. Agency, Inc.*, 401 F.2d at 329-30; *see also Volvo Cars of N. Am., LLC v. United States*, 571 F.3d 373, 379 (4th

---

[10]Other circuits have fashioned their own standards for determining whether a taxpayer may challenge his prior treatment of the tax consequences of a transaction. As these standards do not apply in the Fourth Circuit, we mention them only for informational purposes. Two such standards are the *Danielson* rule and the "strong proof" rule. In *Commissioner v. Danielson*, 378 F.2d 771 (3d Cir. 1967) (en banc), the Third Circuit held that a taxpayer could recharacterize the terms of a transaction only if those terms were unenforceable due to "mistake, undue influence, fraud, [or] duress, etc." *Danielson*, 378 F.2d at 775; *see also Bradley v. United States*, 730 F.2d 718, 720 (11th Cir. 1984) ("A party can challenge the tax consequences of his agreement as construed by the Commissioner *only by adducing proof* which in an action between the parties would be admissible to alter that construction or to show its unenforceability because of mistake, undue influence, fraud, duress, et cetera.") (quotations omitted) (emphasis in original); *Smith v. Comm'r*, 65 F.3d 37, 40 (5th Cir. 1995) ("[A] taxpayer may argue substance over form when necessary to prevent unjust results, and when proof is offered which in an action between the parties would be admissible to alter that construction or to show its unenforceability because of mistake, undue influence, fraud, duress, etc.") (quotations and internal citation omitted).

The "strong proof" rule requires a party to adduce "strong proof" that the parties intended an allocation different than that included in the contract. *See N. Am. Rayon Corp. v. Comm'r*, 12 F.3d 583, 588 n.6 (6th Cir. 1993) ("The 'strong proof' rule requires a party seeking to disregard the express price allocations in an agreement to adduce strong proof that the parties actually intended to attribute different values than those stated in the agreement."); *Rogers' Estate v. Comm'r*, 445 F.2d 1020, 1021 (2d Cir. 1971) ("In this Circuit, the rule is, that when the parties to a transaction . . . have specifically set out the covenants in the contract and have there given them an assigned value, strong proof must be adduced by them in order to overcome that declaration.") (quotation omitted).

Cir. 2009) ("[W]e have long held that the parties' intent and the relevant facts are critical in construing contracts for federal tax purposes."); *Thomas v. Comm'r*, 83 T.C.M. (CCH) 1576 (2002) (recognizing and applying the "economic reality" test). The economic reality test examines (1) the intent of the parties, and (2) the economic substance of the transaction. The determination of the parties' intent and the economic substance of the transaction are questions of fact, with the taxpayer bearing the burden of proof. *Gen. Ins. Agency, Inc.*, 401 F.2d at 329.

The district court concluded that the provisions in the transaction documents, particularly the CPTA and Master Agreement, "strongly demonstrate[d]" that it was the parties' understanding that all Cap Gemini shares would be immediately taxable at the transaction's closing. *Bergbauer*, 2008 WL 3906784, at *5. However, the court recognized that other sections of the transaction documents, namely the forfeiture and stock transfer restriction provisions, could be in conflict with immediate taxation of the non-monetized shares. *Id.* at *8-9.

Without a definitive answer from the plain language of the transaction documents, the district court turned its analysis to the extrinsic evidence, particularly the PID, and found that this evidence "shed[ ] light on the terms of the transaction documents," and demonstrated that "the parties' original intent was for the [c]onsulting [p]artners to be immediately taxed on the entirety of the shares they received at the transaction's closing on May 23, 2000." *Id.* at *10.

We conclude that the district court did not clearly err in this finding. Indeed, the Bergbauers *conceded* the intent prong of the economic reality test on appeal, *i.e.*, that the parties intended the value of all the Cap Gemini shares exchanged for the CGE&Y membership interests be fully taxed in 2000. Even without such a concession, the district court's determi-

nation of intent was strongly supported by the record evidence.

Several provisions of the PID demonstrate that the parties plainly intended for Robert Bergbauer to be immediately taxed on all 10,740 Cap Gemini shares in 2000. Not only did the PID provide that the transaction would be structured as a "taxable capital gains transaction," J.A. 285, but it also stated that "Ernst & Young, its partners, and Cap Gemini [would] treat valuation and related issues consistently." J.A. 285-86. But, most importantly, the PID unequivocally stated that "[a]ll partners [would] vest in their shares immediately upon closing," J.A. 280, and "[t]he gain on the sale of the [CGE&Y interests] [would be] reportable on Schedule D of [their] U.S. federal income tax return for 2000." J.A. 286.

Further, Arthur Gordon, Ernst & Young's director of tax in 2000, testified that the consulting partners knew the intent of the parties was to close the transaction so they would own all the Cap Gemini shares outright that year, thus establishing a cost basis and holding period for long-term capital gain treatment of future sales of the stock. As the district court observed, "even if Robert Bergbauer did not immediately appreciate the operative tax language contained within the PID, after attending the March 7-8, 2000 meeting he was well aware that all parties to the agreement" intended for the consulting partners to be "immediately taxed" on all their Cap Gemini shares in 2000. *Bergbauer*, 2008 WL 3906784, at *9. Finally, the Bergbauers' initial 2000 tax return, wherein they reported as income the value of all 10,740 Cap Gemini shares, demonstrates that the Bergbauers understood the intention to be taxed on the entirety of those shares in 2000.

While the parties intended immediate taxation on all the Cap Gemini shares in 2000, the "economic reality" test requires that there be economic substance to that decision. *See Halle v. Comm'r*, 83 F.3d 649, 655 (4th Cir. 1996) (explaining that "we must look beyond the parties' terminology to the

'substance and economic realities' of the [transaction], gleaned from the totality of the circumstances surrounding the transaction"). In other words, the "economic realities surrounding the transaction in this case [must] confirm" that the parties' agreement to treat the shares as immediately taxable "accurately portrayed their intentions." *Id.*; *see also Wrangler Apparel Corp. v. United States*, 931 F. Supp. 420, 426 (M.D.N.C. 1996) ("The second prong of the *General Insurance* test requires that the covenant bargained for have some independent value grounded in economic reality.").

All parties to the transaction, bargaining at arms-length, had economic reasons to subject the entirety of the consulting partners' Cap Gemini stock to full and immediate taxation in 2000. For consulting partners, like Robert Bergbauer, immediate taxation in 2000 was the means to both start the holding period for capital gains treatment under I.R.C. § 1223, and at the same time establish a high cost basis under I.R.C. § 1012. Both elements were key for Bergbauer and his colleagues to achieve their goal of minimizing tax when they later disposed of the Cap Gemini stock after its anticipated high rise in value.

Cap Gemini, on the other hand, sought to fix its cost basis for the acquired assets in CGE&Y, and, in turn, its amortization deductions under I.R.C. § 197. This course of action also enabled all of the parties to avoid future litigation over conflicting opinions of value if anything other than the agreed value of the Cap Gemini stock was used for tax reporting purposes.

While the stock transfer restrictions and forfeiture provisions presented a potential risk to the consulting partners during the non-monetization period, these provisions were mutually beneficial, in part, to all parties' economic interests. The forfeiture provision clearly benefitted Cap Gemini as a retention mechanism to preserve the consulting partners' client relationships, goodwill, and expertise. But other economic

benefits accrued to Cap Gemini and the consulting partners as well. As Arthur Gordon testified:

> The purpose of the restricted account was to protect the value of the stock. In one moment of time we doubled the number of issued and outstanding shares of Capgemini, the public company. The feeling was if everybody was allowed to go to the market at once, the stock would plummet because you had too many shares without enough buyers. So in order to protect everybody's value, the partners agreed that they would voluntarily restrict their shares with the consideration being that everybody else will restrict their shares. . . .
>
> . . . And it was an agreement that we would all lose certain rights for the benefit of the whole and for us individually.

J.A. 431-32. Thus, it was in each consulting partner's economic interest to agree to restrict every other consulting partner's transfer and sale of shares. Flooding the market with Cap Gemini shares would only depress the price of the stock, thereby damaging every party's economic interest in the transaction.

We therefore conclude that the district court did not err in its conclusion that the terms of the transaction contained "some economic substance beyond the parties' subjective intent." *Bergbauer*, 2008 WL 3906784, at *10. The district court properly determined that the second prong of the economic reality test was met because the terms of the transaction were grounded in "business reality such that reasonable men, genuinely concerned with their economic future, might bargain for such an agreement." *Gen. Ins. Agency, Inc.*, 401 F.2d at 330.

Thus, the value of all the Cap Gemini shares should have been recognized as taxable income in 2000, as agreed to and

reported by all parties, unless the Bergbauers' statutory arguments mandate a different result. We conclude those arguments are without merit.

The Bergbauers' argument as to § 83 is readily rejected. The restrictions under that statute on the recognition of income for property not "transferable" or "subject to a substantial risk of forfeiture" applies only if the property is transferred "in connection with the performance of services." I.R.C. § 83(a). The CGE&Y for Cap Gemini equity interest exchange was clearly not related to the performance of services and the Bergbauers do not contend to the contrary. Thus, the plain terms of § 83 verify that statute has no application to this case.

The argument as to I.R.C. § 451 is similarly unavailing. If Robert Bergbauer had received the Cap Gemini stock in the absence of an agreement, but subject to the forfeiture and restricted transfer provisions, his timing argument for the year of income recognition might have more credence. Of course, he did not receive the Cap Gemini stock in the abstract or in a vacuum. Neither are the tax consequences to be adjudicated in that context, but upon the totality of the circumstances. As the legion of caselaw set forth above clearly illustrates, a taxpayer's choice of tax treatment under a binding contract is not an optional commitment. "[T]axpayers are liable for the tax consequences of the transaction they actually execute and may not reap the benefit of recasting the transaction into another one substantially different in economic effect that they might have made." *Estate of Leavitt*, 875 F.2d at 423.

In this case, the parties bargained for mutually beneficial tax consequences with the consulting partners receiving a high basis for future capital gains treatment in exchange for immediate taxation in 2000. At the same time, Cap Gemini received a set amortization basis in exchange for foregoing the opportunity (or risk) of a different basis if a structured stock-distribution schedule were used. This allocation fixed

the tax consequences for both parties and enabled the Government to receive the benefit of higher taxable income from the consulting partners in 2000, offset over time by Cap Gemini's higher-based amortization deductions in later years, as well as the potential reduced tax when the consulting partners sold Cap Gemini stock at long-term capital gains rates.

The Bergbauers point to no statute or caselaw which would permit them to unilaterally change the agreed upon tax treatment of the transaction, years after the fact, because their prior choices no longer serve their economic interests. Nothing in § 451 or any other provision of the Internal Revenue Code permits a taxpayer to whipsaw the Government and the other parties to the transaction by unilaterally altering the agreed tax treatment, which has economic substance and reflects his intent, after the fact when the winds of change foment delayed seller's remorse. The principle established in *National Alfalfa* is as valid now as when pronounced nearly four decades ago and settles the issue raised by the Bergbauers:

> [W]hile a taxpayer is free to organize his affairs as he chooses, nevertheless, once having done so, he must accept the tax consequences of his choice, whether contemplated or not, and may not enjoy the benefit of some other route he might have chosen to follow but did not.

417 U.S. at 149 (internal citations omitted); *Signet Banking Corp.*, 118 F.3d at 241 (same).

We therefore reject the Bergbauers' contention that § 451 grants them the authority to rewrite the tax treatment of the Cap Gemini stock which they agreed upon, and did, treat as fully taxable income in 2000 and for which there were reasons of bona fide economic substance.

## IV.

As the record reflects, both prongs of the "economic reality" test have been satisfied and the district court did not err in so finding. Accordingly, we affirm the district court's grant of summary judgment to the Government and the court's denial of summary judgment to the Bergbauers.

*AFFIRMED*